**No. 24-11001**

---

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

---

**Justin Thomas Tolston,**

**Appellant**

**v.**

**City of Atlanta, et al.**

**Appellees**

---

**APPELLANT'S OPENING BRIEF**

---

**Justin Thomas Tolston**
***Pro se* Appellant**
**5900 Balcones Dr.**
**Suite 100**
**Austin, TX 78731**

## TABLE OF CONTENTS


I. Jurisdictional Statement.................................................. 7

A. In Addition to Pendent Appellate Jurisdiction, Collateral Order Jurisdiction Reiterated in *Mitchell v. Forsyth*, Makes Clear That Decisions Involving a Grant or Denial of Qualified Immunity Subject an Order to Interlocutory Appellate Review...................................................... 7

B. The Eleventh Circuit's Precedent in *Williams v. Aguirre* and *Hoyt v. Cooks* Make Clear That Decisions Regarding Qualified Are Appealable Interlocutory Orders................ 9

C. The District Court's Order on City of Atlanta's Motion to Dismiss in Collateral to the Appeal of Summary Judgment and is Therefore an Appealable Order............. 10

D. The Court Has Jurisdiction Over Tolston's Appeal in the Spirit of Judicial Economy to Prevent Duplicative Proceedings........................................................... 10

II. Statement of the Case .................................................. 11

III. Statement on Oral Argument......................................... 15

IV. Statement of the Issues.................................................. 15

V. Summary of Argument.................................................. 16

VI. Argument............................................................................ 19

1. The District Court Erred When It Dismissed "Doe Defendants" Prior to Discovery Where They Were Later Identified As Predicted By Tolston and the Court............................................................................ 19

2. The District Court Erred When It Found That Tolston Had "Not 'Allege[d] Any Custom or Policy of the City of Atlanta Which Caused a Constitutional Violation of His

Fourth Amendment Right" Because the Complaint Alleges Body Camera Misconduct.......................................... 22

A. Count II Identified a Plausible Custom, But Namely Improper Body, Sufficient to Sustain Municipal Liability..................................................... 24

3. The District Court Erred When Granted Summary Judgment on Municipal Liability Because There is an Abundance of Evidence to Show the City of Atlanta Was Indifferent to the *De Facto* Custom of Body Camera Non-Compliance..................................................... 27

A. The Atlanta Chief of Police Was the Final Policymaker Regarding Body Cameras for Purposes of Municipal Liability...................................... 29

B. The Noble Auditor's Report and Twelve Internal Affairs Complaints on Body Cameras Show the City of Atlanta Was On Notice of the *De Facto* Custom of Body Camera Non-Compliance........................... 30

i. The Twelve Miscellaneous Complaints of Improper Body Camera Usage in an Nine-Month Span Preceding Tolston's Arrest Show Policymaking Officials Were on Notice of the *De Facto* Custom and the Injuries That Flowed From the Unofficial Policy..................................................... 33

a. Multiple Investigations of Body Camera Non-Compliance Involved Accusations of Unlawful Actions Similar to the Conduct of Officers on the Night of Tolston's Arrest.......... 34

b. The OPS Investigations Revealed Officers at All Levels Flouting the Body Camera Policy, Including Superior Officers......................... 37

c. Several OPS Investigations Show the City of Atlanta Did Not Even Equip All Officers With

Body Cameras Including the Most Violent Unit........................................................ 39

d. The Twelve Aforementioned Internal Affair Complaints Document 20 Instances of Body Camera Non-Compliance, Including 7 Supervising Officers.................................. 40

ii. The Auditor's Report Provided Statistical Data Showing the Widespread and Pervasive Nature of Body Camera Non-Compliance............................ 42

a. Officials Failed to Ensure Body Camera Compliance Between November 2016 to May 2018—Preceding Appellant's Arrest............... 43

C. The Year Following the Auditor's Report Excessive Forced Increased 70% Which Shows a Causal Connection Between Body Worn Cameras and Excessive Force................................................ 45

D. The Chief of Police Did Not Update Body Camera Policy Until 2021—After the City of Atlanta Was Sued by Tolston—and Still Has Not Implemented Annual Training Despite Knowledge of Deficiencies.. 46

E. Mayor Keisha Lance Bottoms Only Sign Administrative Orders Address Policing Following Civil Unrest.................................................... 48

4. The Court Erred When It Held That Tolston Failed to Establish Single Event *Monell* Liability Despite the Blatantly Obvious Need For Training Because at Least Ten Officers Improperly Used Their Body Cameras During Tolston's Arrest in Detention........................ 51

A. Officers Wadsworth and Holland Failed to Activate Their Body Prior to Their Interaction With Tolston and Therefore Failed to Capture the Use of Force..... 53

B. Two Officers Standing in the Vicinity of Tolston Did Not Adhere to Body Camera Protocol..................... 54

C. Four Officers at the Pavillion Where Tolston Was Detained Were Not Even Equipped With a Body Camera Despite Policy That Required Officers Use the Devices During Extra Shifts........................... 55

D. At Least Two Superior Officers Engaged in Blatant Body Camera Malfeasance While Not Ensuring Subordinates Adhered to Policy............................ 56

E. The Premature Deactivation of Officers' Body Cameras Prevented Capturing the *Quid Pro Quo*..... 57

F. Ten Officers Engaged in Body Camera Noncompliance Which Demonstrated a Blatantly Obvious Need for Training.................................. 58

G. The Additional Ten (10) Instances of Body Camera Non-Compliance Coupled with the 21 Instances from the OPS Investigations Should Result in a Finding of Municipal Liability........................................ 59

5. The District Court Erred When It Held Tolston Did Not Establish Municipal Liability Regarding the Failure to Hire, Train and Supervise Officers and Internal Affairs.... 60

A. The City of Atlanta's Office of Professional Standards Had Only Five (5) Investigators to Conduct Investigations Into Nearly 2000 Atlanta Police Officers Which Clearly Shows a Failure to Hire Staff and Fund Internal Affairs..................... 63

B. Evidence Shows It Was Nearly Impossible for the Investigations by Internal Affairs To Complete Investigations Within 180 Days........................... 65

C. The Police Chief and Investigator Walton Testified That Hiring More Investigators Would Have Allowed

Investigations to be Conducted More Timely........................................................ 67

D. Despite the Acknowledged Need for More Investigators, the Chief of Police Advised That None of 250 Proposed Additional Officers Would Be Assigned to Internal Affairs............................... 67

6. The District Court Erred in Finding That "Wadsworth Was Acting Within the Scope of His Discretionary Authority"...................................................................... 69

7. The District Court Committed Clear Error By Failing to Take Judicial Notice of the Population of the City of Atlanta................................................................... 71

8. The District Court Erred When It Granted Summary Judgment on Tolston's First Amendment Retaliation Claim........................................................................ 73

A. Tolston's Request for "Everyone's Badge Number" Was Protected Speech and Lawful Pursuant to an Active Consent Decree....................................... 74

B. Officer Prolonging Tolston's Detention for at Least Sixteen Minutes Was a Fourth Amendment Violation and Adverse Action............................... 76

9. The District Court Erred In Granting Summary Judgment on Tolston Malicious Prosecution and Abuse of Process Claim By a Misapplication of Law.......................... 78

10. The District Court Erred When It Denied Tolston's Motion for A Preliminary Injunction Regarding Mandatory Use of Body Cameras................................ 83

VII. Conclusion........................................................................ 90

Table of Authority........................................................................ 92

# I. Jurisdictional Statement

## A. In Addition to Pendent Appellate Jurisdiction, Collateral Order Jurisdiction Reiterated in *Mitchell v. Forsyth*, Makes Clear That Decisions Involving a Grant or Denial of Qualified Immunity Subject an Order to Interlocutory Appellate Review

The Eleventh Circuit has jurisdiction to adjudicate Tolston's appeal under the theories of collateral order doctrine; pendant appellate jurisdiction doctrine; and in the name of judicial economy.

The "Supreme Court has reiterated that when legal questions of qualified immunity are raised—either to determine whether a constitutional right was violated or whether the violation of that right was clearly established—interlocutory appellate jurisdiction exists."[1]

In *Mitchell v. Forsyth*, when an appeals court declined to exert jurisdiction over an appeal regarding qualified immunity and "remanded the case to the District Court for further proceedings leading to entry of final judgment[,] Mithchell filed a timely petition for certiorari seeking review of the court's rulings on both absolute and qualified immunity."[2] The Supreme Court held: "An appealable interlocutory decision [m]ust conclusively determine the disputed

---

[1] *Hall v. Flournoy*, 975 F. 3d 1271, 1274, 1276 (11th Cir. 2020).
[2] *Mitchell v. Forsyth*, 472 U.S. 513, 518 (1985).

question[,] and that question must involve a claim of right separable from, and collateral to, rights asserted in the action."[3]

Here, the order by the district court was conclusive regarding Tolston's claims of municipal liability because the City of Atlanta was granted qualified immunity regarding those claims. The order was also conclusive regarding granting qualified immunity relating to Keith Wadsworth as to the claims of malicious prosecution/abuse of process and First Amendment retaliation.

Like in *Mitchell*, there is no subsequent decision that the court can render that would revive those claims. Thus, the district court's order was conclusive as it will preclude both the City of Atlanta and Keith Wadsworth from standing trial on those issues.

Regarding the second element of separability, the doctrine at issue is separate from the claims of the violations of Tolston's rights as the doctrine of qualified immunity was used to deny Tolston's claims prior to a trier of fact judging their veracity.

However, the City of Atlanta and Wadsworth contend: the order is not appealable under the collateral order doctrine because the ruling

---

[3] *Mitchell*, 472 U.S. 527 (internal quotations and citations omitted).

was not "final".[4] That argument fails because although the court's order did not end the litigation *en toto*, it did end litigation regarding numerous claims, parties, and issues. Thus, the Court has jurisdiction to adjudicate the instant appeal.

### B. The Eleventh Circuit's Precedent in *Williams v. Aguirre* and *Hoyt v. Cooks* Make Clear That Decisions Regarding Qualified Are Appealable Interlocutory Orders

The Eleventh Circuit has held that denials—and presumably grants—of qualified immunity are appealable orders, therefore the Court has jurisdiction.

In *Williams v. Aguirre*, the Court held: "Although we ordinarily have no jurisdiction to review the denial of a motion for summary judgment, we can review denials [and grants] of qualified immunity and state-agent immunity under the collateral-order doctrine."[5]

Similarly, in *Hoyt v. Cooks* the Court held: "We have jurisdiction over this interlocutory appeal because the case presents the core qualified immunity analysis[.]"[6]

---

[4] Doc. 96 p. 4.
[5] *Williams v. Aguirre*, 965 F. 3d 1152, 1156 (11th Cir. 2020).
[6] *Hoyt v. Cooks*, 672 F.3d 974, 977 (11th Cir. 2012) (internal quotations omitted).

The district court heavily discussed the doctrine of qualified immunity, thus the Court's precedent makes clear the summary judgment ruling is an appealable interlocutory order.

### C. The District Court's Order on City of Atlanta's Motion to Dismiss in Collateral to the Appeal of Summary Judgment and is Therefore an Appealable Order

The order on City of Atlanta's motion to dismiss is inextricably intertwined with Tolston's appeal because it resolved issues related to: 1) The joinder of Lawrence Holland by dismissing doe defendants; and it 2) Dismissed Tolston's claim of municipal liability regarding excessive force. Therefore the Court ought to exert jurisdiction over Tolston's appeal related to the motion to dismiss order to avoid duplicative proceedings and to provide decisive relief.

### D. The Court Has Jurisdiction Over Tolston's Appeal in the Spirit of Judicial Economy to Prevent Duplicative Proceedings

Beyond collateral order doctrine and pendent appellate jurisdiction based on the cross-appeal:[7] The Court should exert jurisdiction over Tolston's appeal in the spirit of judicial economy and to promote the orderly administration of justice. Failing to adjudicate Tolston's appeal on the merits at this stage given the cross appeal,

[7] Dckt. 24.

would in effect force the Court and the parties to relitigate the same legal issues and theory post-trial—which could lead to a second trial if the Court were to rule in Tolston's favor. Instead, the Court can exercise its broad discretion and adjudicate both appeals on the merits in the spirit of judicial economy and to prevent duplicative proceedings.

## II. Statement of the Case

On October 14, 2018, Tolston—who was not resisting, posed no threat, was not fleeing, and ultimately accused of minor city ordinance violations[8]—had been enjoying a Pride festival in Piedmont Park in Atlanta, Georgia, during a rare break from Master of Laws studies.[9] As Tolston was leaving the public park, Tolston and officer Lawrence Holland made *de minimis* contact as Tolston walked downhill with one hand holding a beverage and the other holding an electric GoTrax scooter which was never recovered following the seizure of the property incident to the arrest.[10]

---

[8] Dckt. 90-6 p. 158, App'x Vol. 6, Tolston Declaration; Doc. 237 p. 81, Order on Defs'. Mot. SMJ ("Under Tolston's version of the facts, he was not resisting or struggling or attempting to flee, and was at most suspected of misdemeanor offenses, so the law clearly did not permit the officers tackling him to the ground.").

[9] Dckt. 90-6 p. 6, Tolston dep. 18:15–18, 152:16–21.

[10] *Id.* at 22, Tolston dep. 83:10-25.

After the *de minimis* contact in the midst of revelars—Tolston stood there stunned.[11] Officer Lawrence Holland turned around and immediately dispossessed Tolston of property, cussed at Tolston, and gave an unclear and vulgar move-on order by stating "Keep if fucking moving".[12] Tolston responded: "What's the problem"[13] or "What's going on".[14]

Without any provocation, or advising that Tolston of being under arrest, Lawrence Holland proclaimed "that's it" and initiated force by grabbing Tolston.[15] Officer Keith Wadsworth then slammed Tolston on the ground,[16] rendering Tolston unconscious due to a neck and traumatic brain injury which was later diagnosed at a student health center.[17] Immediately after the use of force, Tolston asked "Why are you

[11] Dckt. 90-6 p. 20, App'x Vol. 6, Tolston dep. 75:6–25.
[12] *Id.* p. 21, Tolston dep. at 77: 19-22.
[13] *Id.* at 77:23-25.
[14] *Id.* p. 18, Tolston dep. 68:13-17; See Dckt. 90-6 p. 76, Wadsworth dep. 38:1-2 (Wadsworth testified Tolston said "Why are you being mean to me?").
[15] Dckt. 90-6 p. 21, Tolston dep. 77:14-25 to 78:1-10.
[16] Doc. 168, Wadsworth BWC 1, Pl. Exh. 11 at 0:21-23 (Wadsworth states "I had to slam him").
[17] Dckt. 90-5 pp. 43-47, App'x Vol. 5, Student Health Record; Dckt. 90-5 p. 49, Accommodations Letter.

doing this?": But in response to those inquiries Officer Lawrence Holland told Tolston "We're done talking."[18]

The use of force was followed by an attempted cover-up where both officers deactivated their body cameras, and then presented Tolston in front of a superior officer who offered Tolstson a *quid pro quo*.[19] After Tolston declined the unlawful *quid pro quo*—while Tolston was in the process of being released with one hand uncuffed—Tolston requested the badge numbers of all the officers on the three times scene,[20] in line with a consent decree requiring officers to reveal their identity.[21] In immediate retaliatory response, Officer Lawrence Holland stated: "He's gonna take a ride" and again restrained Tolston's liberty via handcuffs.[22]

At that point, officers needlessly prolonged the detention and Tolston was taken to a park pavilion, where Wadsworth's body camera

---

[18] Doc. 168, Body camera footage, Pl. Exh. 16 at 0:23-28.
[19] Doc. 168, Wadsworth BWC 1, Pl. Exh. 11 at 4:06-22; Dckt. 90-6 p. 23, Tolston dep. at 86:4-16; Dckt. 90-5 p. 20 at 114-120, App'x Vol. 5, Tolston OPS Interview.
[20] Doc. 168, Wadsworth BWC 1 at 1:35–50.
[21] *Calhoun v. Pennington*, 1:09-cv-03286 (N. D. Ga. Dec. 08, 2010).
[22] Doc. 168, Wadsworth BWC 1, Pl. Exh. 11 at 1:35–50.

footage shows Tolston was held for at least 40 minutes.[23] At the pavilion, and working in concert, the pair of officers cited Tolston with the three city ordinance offenses[24]: (1) "prohibited conduct,"[25] (2) "city obstruction [of a peace officer}";[26] and (3) "public intoxication".[27]

A physician working as a medic stated he did not smell liquor on Tolston breath despite coming within inches of Tolston's face. Tolston declared that Tolston's "speech was not slurred"; Tolston"did not get into Officer Holland's face"; Tolston "did not argue with officer[s]".[28]

After release from custody Tolston made numerous calls to 911 requesting medical transport to nearby Grady Memorial Hospital due pain from the head trauma[29]—but officers on the scene at the park repeatedly cancelled Tolston's transport.[30]

[23] Doc. 168, Wadsworth BWC 2, Pl. Exh. 12; Dckt. 90-6 p. 23, Tolston Dep. at 87:23–88:3.
[24] Dckt. 90-5 p. 5, citation issued by Wadsworth on Oct. 14, 2018.
[25] Dckt. 90-5 pp. 32-36, App'x Vol. 5, Ordinance 110-59 (The citation is silent on the subsection Tolston allegedly violated).
[26] *Id.* pp. 41-42, Ordinance 106-81.7, disorderly conduct (subsection 7 is identified on the citation: "It shall be unlawful for any person [to] Interfere, by acts of physical obstruction, another's pursuit of a lawful occupation").
[27] *Id.* pp. 38-39, Ordinance 10-9, disorderly while under the influence.
[28] Dckt. 90-6 p. 158, App'x Vol. 6, Tolston Declaration.
[29] Dckt. 90-5 pp. 56-64, App'x Vol. 5, Dispatch logs from Tolston's 911 calls.
[30] *Id.*

The use of force and arrest and preceding events were not captured on camera because the arresting officers belatedly activated and prematurely deactivated their devices multiple times—and eight other officers did not use their body camera devices at all to capture the detention. Ten days after the arrest, Tolston met with internal affairs to file a complaint, which took nearly a year to adjudicate.[31] The harm of the arrest was compounded by a failed nineteen-months-long prosecution that ruined Tolston's year-long master of laws program.

## III. Statement on Oral Argument

If and only if it may please the Court, Tolston seeks oral arguments before the Court's tribunal to answer any questions that may impact a decision by the Court given the numerous issues presented on appeal. However, if in the Court's opinion, the voluminous district court and appeal records provide sufficient evidence and discussion to aid in the decisional process—Tolston does not object to the Court foregoing oral argument.

## IV. Statement of the Issues

1. Whether the district court improperly dismissed "Doe Defendants" prior to discovery when they concealed their identity during the

[31] Dckt. 90-5 p. 68, OPS Memorandum from Tolston's complaint

arrest and were later identified as predicted by Tolston and the district court?

2. Whether the district court erred when it granted City of Atlanta's motion to dismiss Tolston's municipal liability claim concerning excessive force prior to discovery?
3. Whether the district court erred when it granted summary judgment on municipal liability by ruling that Tolston "failed to show triable issues of fact as to the municipal policy and causation elements of his *Monell* claims"?
4. Whether the district court erred when it held that Tolston failed to establish single-event Monell liability?
5. Whether the district court erred when it declined to find Tolston established a failure to hire, train, and supervise claim of municipal liability?
6. Whether the district court erred in finding that "Wadsworth was acting within the scope of his discretionary authority?
7. Whether the district court erred in failing to take judicial notice of the population of the City of Atlanta when determining municipal liability?
8. Whether the district court in granting summary judgment on Tolston's malicious prosecution and abuse of process claim?
9. Whether the district court erred when the court ruled Wadsworth was entitled to summary judgment on Tolston's First Amendment retaliation claim?
10. Whether the district court erred when it denied Tolston's motion for injunctive relief to enjoin officers of the Atlanta Police Department from deactivating their body worn cameras at any point while interacting with a citizen in their custody.

## V. Summary of Argument

Tolston seeks the Court to independently review the numerous issues presented regarding Tolston's arrest at a festival following *de minimis* contact in Piedmont Park in Atlanta, Georgia on October 14, 2018 at a Pride Festival.

Tolston maintains that officers were not justified in the use of any force against Tolston as they did not have arguable probable cause to arrest and cite Tolston for anything as the district court noted: "It would not be unusual for some amount of inadvertent jostling to occur amongst festivalgoers at a well-attended, outdoor celebration."[32]

Keith Wadworth cited Tolston, in concert with Lawrence Holland, out of retaliatory animus fueled by Tolston's protected speech in requesting their badge numbers to hold them accountable.

Any probable cause that may have existed had clearly dissipated by the time Tolston was being released and was halfway unhandcuffed.

Even if arguable probable cause existed to make an arrest, the force used was objectively excessive as Tolston was not fleeing; was not resisting; accused of only minor offenses; had no weapon—and had not been informed of being under arrest or that officers intended to physically escort Tolston out the park at the time officers went hands-on, rendering Tolston unconscious.

[32] Dckt. 90-4 p. 40, App'x Vol. 4, Order on SMJ.

At its heart, this case is about body cameras and how the City of Atlanta acted deliberately indifferent to ensuring their proper use which led to a culture of lawlessness that resulted in the violation of Tolston's rights.

Despite policy to the contrary, none of the events preceding the use of force were captured on film.

Policymakers failed to even equip some officers with body cameras; and ratified the unofficial practice of belated activation and premature deactivation, or complete body cam non-usage.

Tolston asserts a jury could find that the widespread and pervasive unofficial policy was the direct cause of the excessive force, false arrest, malicious prosecution, First Amendment retaliation, and state law claims.

The unofficial policy of body camera noncompliance on the front end was inextricably linked with the cover-up on the back end through the patently understaffed and underfunded Office of Professional Standards (hereinafter "OPS" or "internal affairs").

The City of Atlanta (hereinafter "Atlanta" or "City") was on notice since **at least 2014 of the importance of the body camera devices.**[33]

Due to officers failing to give their identity, or use their body cams, this case has ripened an opportunity to broaden the exception to on fictitious parties—and impose injunctive relief to mandate the usage of body cameras.

## VI. Argument

### 1. The District Court Erred When It Dismissed "Doe Defendants" Prior to Discovery Where They Were Later Identified As Predicted By Tolston and the Court

Upon *de novo* review,[34] the Court should find the district court improperly dismissed Doe defendants because they were later ascertained during discovery and their identities were unknown due to blatant violation of a legally binding consent decree.

---

[33] Dckt. 90-5 p. 166, App'x Vol. 5, Noble Auditor Report on body cameras.

[34] *Doe v. Pryor*, 344 F.3d 1283, 1284-85 (11th Cir. 2003) ("The district court dismissed this case at the pleading stage, so general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (internal quotations omitted); See *Jackson v. City of Atlanta*, 22-12946 (11th Cir. 2024).

Constrained by existing case law the district court was probably right to dismiss the fictitious Doe defendant officers at the motion to dismiss stage of litigation.[35] Thus, Tolston seeks the Court to broaden the exception to pleading fictitious parties.

Tolston originally pleaded numerous Doe Defendants.[36] However, agreeing with Appellees, the district dismissed those parties prior to discovery.[37]

The court reasoned "As a general matter, fictitious-party pleading is not permitted in federal court"[38] because "There is only one 'limited,' 'narrow' exception to this rule."[39]

The court noted that Tolston "insists '[t]he complaint contains sufficient specificity to ascertain the unknown parties' identities through discovery."[40] Agreeing with Tolston, Honorable Michael L. Brown concluded: "And he is probably right."[41]

---

[35] *Wayne v. Jarvis*, 197 F.3d 1098, 1103 (11th Cir. 1999).
[36] Dckt. 90-1 p. 38, App'x Vol. 1, original complaint at 1.
[37] *Id.*
[38] Dckt. 90-1 p. 179, App'x Vol. 1, order on mot. to dismiss at 7 (quoting *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010)).
[39] *Id.* (quoting *Kabbaj v. John Doe 1-10*, 6000 F. App'x 638, 641 (11th Cir. 2015)).
[40] *Id.* at 180.
[41] *Id.*

However, Judge Brown explained: "the Eleventh Circuit 'has never permitted John Doe pleading solely on the ground that discovery might reveal an unnamed defendant's identity.'"[42]

There is a circuit split on this issue as the sixth circuit holds the same view as this Court.[43] However, the Eighth Circuit Court of Appeals adheres to a slightly broader approach to fictitious parties which Tolston prays the Court endorse.

In *Perez v. Does 1-10*, 931 F.3d 642, 646 (8th Cir. 2019), the court outlined that John Doe or fictitious parties can be named as a place holder of sorts if their identity can be reasonably ascertained through discovery.[44] The Third Circuit Court of Appeals also allows the naming of Doe parties if they can be ascertained through discovery.[45]

Similarly, the First Circuit Court of Appeals allows the naming of fictitious parties where the identity of the parties could not be

[42] Dckt. 90-1 p. 180, Order on Mot. to dismiss (citing *Vielma v. Gruler*, 808 F. App'x at 880).
[43] *Cox v. Treadway*, 75 F.3d 232, 240 (6th Cir. 1996).
[44] *Perez v. Does 1-10*, 931 F.3d 642, 646 (8th Cir. 2019); see also *Munz v. Parr*, 758 F.2d 1256, 1257 (8th Cir.1985).
[45] *Hinds v. FDIC*, 137 F.3d 153, 155 (3rd Cir. 1998).

ascertained through reasonable investigation prior to litigation and the identity of the party is able to be revealed through discovery.[46]

Thus, this case presents an opportunity for the Court to align with its sister circuits to allow the pleading of fictitious parties if they are able to be reasonably ascertained during discovery.

Here, Tolston pleaded the doe defendants using the only description available at the time, which were "police officer[s] for the City of Atlanta" and a "police Sergeant for the City of Atlanta" mainly because officers refused to identify themselves during the interaction–in violation of an active consent decree.[47]

However, the district court held that the description was insufficient, thus the Court should rule that the district court erred when it dismissed John Doe officers prior to discovery and thereby broaden the current exception to the fictitious party rule to allow the pleading of such parties when they can be ascertained through reasonable discovery.

### 2. The District Court Erred When It Found That Tolston Had "Not 'Allege[d] Any Custom or Policy of the City of Atlanta

[46] *Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 5, 8 (1st Cir. 2007).
[47] Dckt. 90-1 p. 179, App'x Vol. 1, order on mot. to dismiss at 8; See *Calhoun v. Pennington*, 1:09-cv-03286 (N. D. Ga. Dec. 08, 2010).

**Which Caused a Constitutional Violation Regarding the Excessive Force Claim Because the Complaint Alleges Body Camera Misconduct as the Unofficial Policy**

Upon *de novo* review,[48] the Court should find that the district court erred when it dismissed Count II seeking municipal liability for excessive force because Tolston's complaint—which should be "liberally construed" as a *pro se* party[49]—clearly identified improper and non-use of body cameras as the *de facto* practice or custom that gave rise to the use of force against Tolston on October 14, 2018.

Count II of the original complaint sought "Liability of the City of Atlanta, Georgia for the 42 U.S.C. 1983 excessive force constitutional violations against Plaintiff".[50] Under the law, "Municipalities may only be held liable under section 1983 if action pursuant to official municipal policy of some nature caused a constitutional tort."[51]

Municipal "liability will attach for constitutional deprivations" occurred "pursuant to governmental custom even though such a custom

---

[48] *Miller v. U.S. Dep't of Agr. Farm Servs. Agency*, 143 F.3d 1413, 1414-15 (11th Cir. 1998).
[49] *Brown v. Johnson*, 387 F.3d 1345, 1350 (11th Cir. 2004).
[50] Dckt. 90-1 p. 57, App'x Vol. 1, original compl.
[51] *Church v. City of Huntsville*, 30 F.3d 1335, 1342 (11th Cir. 1994) (citing cases) (internal quotations omitted).

has not received formal approval through the municipality's official decisionmaking channels."[52]

Here, in support of Count II, Tolston pleaded forty-two excessive force complaints against Atlanta police officers between 2017-18, but the court reasoned Tolston did not say "how many of the 42 excessive force complaints were sustained."[53]

The district court ruled Plaintiff's allegation of municipal liability for excessive force failed because "the amount alleged here is too low as a matter [and] The Eleventh Circuit has said this number of sustained claims is insufficient to establish a custom of excessive force."[54]

The district court held: "The Court dismisses Count 2 for failure to plead a policy or custom—adopted with 'the requisite degree of culpability'—that caused Plaintiff's injuries."[55] However, Tolston clearly pleaded a plausible single-event pattern of body camera noncompliance.

### A. Count II Identified a Plausible *De Facto* Custom Sufficient to Sustain Municipal Liability

[52] *Church*, 30 F.3d 1342-43 (cleaned up & citing *Monell v. Dep't Soc. Serv.*, 436 U.S. 660, 691 (1978))
[53] Dckt. 90-1 p. 187, App'x Vol. 1, order on mot. to dismiss at 15.
[54] *Id.*
[55] *Id.* at 187.

Tolston's complaint regarding Count II specifically stated: "Defendant City of Atlanta, Georgia has failed to effectively screen, train, supervise, discipline, and/or control the people it employs as police officers" before concluding as a "direct result of Defendant City of Atlanta's **customs and practices**, Plaintiff suffered damages."[56] (emphasis added) The fact the words "practices" and "customs" are plural in Count II gives sufficient notice that there was more than one custom at play as the interplay between body camera non-compliance is inextricably linked with the instances of excessive force and other misconduct coupled with the contributing factor of understaffing and underfunding of the Office of Professional Standards because internal affairs failed to hold officers accountable thereby encouraging their widespread and pervasive unlawful conduct.

In Count XVII of the complaint, it made several references to body worn camera improper usage to give sufficient notice pursuant to *Iqbal* that the custom of body worn camera non-compliance was at issue as related to causing Tolston's injuries.[57]

---

[56] Dckt. 90-1 p. 58, App'x Vol. 1, original compl.
[57] *Id.* p. 95; See *Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009).

The cause of action specifically states: "Prior to October 14, 2018, Defendants developed and maintained policies, custom[s], and practices exhibiting deliberate indifference to the constitutional rights of persons in Atlanta, which caused violation of Plaintiff's rights" and "The Chief [of Police] is responsible to ensure all officers adhere to the Atlanta Police Department body camera protocol."[58]

Count XVII further details: "All sworn supervisors are responsible for ensuring that officers under their command are wearing, recording, tagging, and uploading their Body Worn Camera (BWC) footage."[59] Thus, in the light most favorable to Tolston, there was clearly a custom and *de facto* practice identified in the original complaint to give sufficient and plausible notice of the custom or policy at play.

The complaint even details the specific actions taken by officers on the night of Tolston's arrest that acted as the invisible moving force behind the violation of Tolston's rights.

Count XVII states that "Officer FNU Wadsworth"; "Officer John Doe 1"; "Officer John Doe 2"; "Officer John Doe 3"; "Officer John Doe 4"; and "Officer John Doe 5" "failed to ensure" their "BWC was active and

---

[58] Dckt. 90-1 p. 95, App'x Vol. 1, original compl.
[59] *Id.*

recording **before** interactions with Plaintiff";[60] "failed to ensure" their "BWC was active and recording **during** interactions with Plaintiff";[61] "failed to **tag**" their "BWC footage of the interactions with Plaintiff.";[62] and "failed to **upload**" their "BWC footage of the interactions with Plaintiff."[63] (emphasis added)

Furthermore, the district court allowed similarly styled Count X cause of action regarding municipal liability for First Amendment retaliation and the court allowed Count XVII to survive. Therefore, Count II should have similarly survived at the motion to dismiss stage under the totality of the facts in the complaint as alleged.

Thus, upon *de novo* review the Court should conclude that the district court erred when it dismissed municipal liability against the City of Atlanta for Tolston's excessive force claim.

**3. The District Court Erred When It Granted Summary Judgment on Municipal Liability Because There is an Abundance of Evidence to Show the City of Atlanta Was Indifferent to the *De Facto* Custom of Body Camera Non-Compliance**

---

[60] Dckt. 90-1 p. 97, App'x Vol. 1, original compl. at 60.
[61] *Id.* pp. 97-98.
[62] *Id.* p. 98.
[63] *Id.* pp. 98-99.

The district court noted: "Tolston asserts four § 1983 claims against the City of Atlanta: (1) false arrest (Count 8), (2) First Amendment retaliation (count 10), (3) malicious prosecution (Count 16), and (4) "negligent hiring, failure to supervise and train" (Count 18)[.]"[64]

The court surmised that Tolston's "*Monell* theory [is] that the City's alleged custom of tolerating noncompliance with its BWC policies caused the constitutional violations at issue in this case."[65]

On the record for purposes of establishing *Monell* liability is every element that is necessary to show: 1) that the City of Atlanta's police officers engaged in a widespread practice or *de facto* custom and unofficial policy of body camera non-compliance;[66] 2) the City of Atlanta's chief of police knew of the practice and *de facto* custom[67] evidenced by testimony coupled with the OPS complaints showing

---

[64] Dckt. 90-4 p. 180, App'x Vol. 4, district court order on SMJ at 91.
[65] *Id.*
[66] Dckt. 90-5 p. 159-95, App'x Vol. 5, Atlanta City Auditor report on body camera non-compliance.
[67] Dckt. 90-6 p. 118, App'x Vol. 6, Chief Rodney Bryant dep. 19:14-18; **See** Dckt. 90-6 p. 162, App'x Vol. 6, Depo. Chief Ericka Shields 15:17-24 ("we have been afforded **finally a window into police operations on a day-to-day basis through body-worn camerasF**. And I think that it's incumbent upon all law **enforcement agencies to have body-worn cameras and to consistently audit them so that we can vet out any misappropriate behavior before it escalates**.") (emphasis added).

widespread body worn camera noncompliance; 3) officials took no action to remedy the issue and were indifferent to the abuse that flowed from the unofficial policy until after civil unrest;[68] and 4) Tolston, and many others, suffered direct harm related to the practice and *de facto* custom.

### A. The Atlanta Chief of Police Was the Final Policymaker Regarding Body Cameras for Purposes of Municipal Liability

In order to establish municipal liability based on ratification a party must identify the final decisionmaker.[69] A final policymaker is ascertained when their decisions are not subject to meaningful review.[70]

Here, Ericka Shields, the Atlanta police chief at the time of Tolston's arrest, signed the body camera policy in effect at the time of

---

[68] Dckt. 90-5 pp. 90-104, Administrative Orders regarding police reform.

[69] *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (a municipality can be found liable "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority.").

[70] *Mandel v. Doe*, 888 F.2d 783, 792-94 (11th Cir.1989) (recognizing that a municipal officer has final policymaking authority when his decisions "are not subject to review" and holding that discretionary review initiated by the municipal official himself does not prevent the official from being a final policymaker); See *Gretch v. Clayton Cty., Ga*, 335 F.3d 1327, 1351 (11th Cir. 2003) ("An official must have discretion in a particular area of law in order to exercise final policymaking authority in that area and may not be subject to significant review").

Tolston's arrest on December 14, 2017—nearly a year before the arrest on October 14, 2018.[71]

The policy required officers to use their body cameras during regular and extra shifts.[72] The policy also made "The Chief of Police or his/her designee, shall be the final approving authority regarding the BWC[.]"[73]

Thus, the chief of police was the chief policymaker regarding body worn cameras.

### B. The Noble Auditor's Report and Twelve Internal Affairs Complaints on Body Cameras Show the City of Atlanta Was On Notice of the *De Facto* Custom of Body Camera Non-Compliance

To show the policymaker had notice of deficiencies and were indifferent, Tolston relies on a report on body camera non-compliance by the Atlanta auditor and twelve investigations by the understaffed internal affairs.

[71] Dckt. 90-5 p. 80, App'x Vol. 5, Shields BWC policy.
[72] *Id.*
[73] *Id.*

To establish municipal liability: "A Plaintiff must demonstrate a direct causal link between the municipal action [or deliberate indifferent inaction] and the deprivation of federal rights."[74]

However, “Since a municipality rarely will have an express written or oral policy of inadequately training or supervising it employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a' deliberate indifference' to the rights of its inhabitants[.]”[75] A “custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law."[76]

In *Brooks v Schieb*, James Brooks claimed the City of Atlanta's "internal investigatory procedures were deficient and that, consequently, the City employed a police officer who improperly arrested and assaulted him.”[77] In Brooks, the “jury agreed and found

---

[74] *Cuesta v. School Bd. Of Miami Dade Cty. Fla.*, 285 F.3d 964, 967 (11th Cir. 2002) (citing *Gilmere v. City of Atlanta, Ga.*, 737 F.2d 897,901 (11th Cir. 1984)).
[75] *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 381, 388- 39 (1989)).
[76] *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).
[77] *Brooks v. Schieb*, 813 F.2d 1192, 1192 (11th Cir. 1987).

the City liable for Brooks' injuries."[78] The evidence Brooks presented at trial included "four Atlanta police officers; the current commissioner and former chief of police, the current head of the office of professional standards, the past head of the office of professional standards, and a field investigator in that office."[79]

Besides the witnesses "Brooks' claim against the City also relied "One was the official rules promulgated by the police department for investigating complaints against police officers [and] Brooks' other key piece of evidence consisted of ten citizens' complaints that had been filed against Scheib, seven prior to the arrest of Brooks and three following."[80] However, in overturning the jury verdict, the Court in *Brooks* ruled: "the City was not at fault under any conceivable standard of liability [because] Quite simply, there is no evidence that city officials were aware of past police misconduct."[81]

[78] *Brooks*, 813 F.2d 1192.
[79] *Id.*
[80] *Id.*
[81] *Id.* at 1195 (holding "Brooks adduces no evidence from which a jury could infer that these allegedly deficient procedures were the 'moving force of the constitutional violation.'" (quoting *Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981)).

Here, evidence shows Atlanta officers engaged in a *de facto* custom of body worn camera non-compliance—and policymakers were on notice of the violations of rights that flowed from the unofficial policy but did nothing.

Despite more evidence proffered by Tolston than in *Brooks*, the court held: "There is simply no record evidence here to permit a jury to find that the alleged injury would have been avoided if the officers had been trained 'under a program that was not deficient in the identified respect.' [and] Plaintiff offers no expert witness or other evidence to connect the dots between the failure to train and the injury."[82]

#### i. The Twelve Miscellaneous Complaints of Improper Body Camera Usage in an Nine-Month Span Preceding Tolston's Arrest Show Policymaking Officials Were on Notice of the *De Facto* Custom and the Injuries That Flowed From the Unofficial Policy

The court noted: "In some instances, a failure to train and/or supervise may amount to a policy or custom demonstrating deliberate indifference by a municipality to the rights of arrestees."[83] The court

[82] Dckt. 90-4 p. 186, App'x Vol. 4, Order on SMJ.
[83] Dckt. 90-4 p. 182, App'x Vol. 4, Order on SMJ (citing *Favors v. City of Atlanta*, 849 F. App'x 813, 817–20 (11th Cir. 2021); *Vineyard v. Cnty. Of Murray, Ga.*, 990 F.2d 1207, 1212 (11th Cir. 1993)).

correctly noted that Tolston argued: “that officers frequently failed to activate their BWCs during encounters with citizens [and] this practice, according to Tolston, ‘created a culture’ that led City police officers to commit the underlying constitutional violations against him.”[84] Tolston submitted twelve reports from internal affairs documenting twenty officers engaging in body camera non-compliance which thereby shows the City of Atlanta was on notice.

a. **Multiple Investigations of Body Camera Non-Compliance Involved Accusations of Unlawful Actions Similar to the Conduct of Officers on the Night of Tolston’s Arrest**

In investigation 18-C-0066-MISC, the complainant's email—**directed to then Chief of Police Shields**—included an allegation of excessive force in stating: "[The APD officer] asked me to leave and started pushing me out of line[,] I asked him to not put his hands on me and he pushed me with even more force. I asked Officer Pearson for his badge number, he answered he that he did not have to give it to me[.]"[85] The complaint is analogous to Tolston’s claim of excessive force—and the refusal of the arresting officers to identify

[84] Dckt. 90-4 p. 183.
[85] Dckt. 90-5 p. 145-46, App’x Vol. 5, OPS Complaint 18-C-0066-MISC.

themselves. The complaint was emailed with attention to the chief of police and thereby gave her actual record notice of the pattern of non-compliance.

Beyond the actual record notice, she had a duty as the chief to inquire as to whether the pattern was a one-off or it was more systemic in nature since the internal affairs office reported to her. Moreover, this complaint was clearly misclassified as “miscellaneous” despite being an instance of excessive force because it was alleged the officer “push[ed]” and “put his hands on” the citizen—just like what happened to Tolston.

The OPS investigator in OPS 18-C-0322-MISC, concerning an interaction where a woman alleged—she had been thrown to the ground by officers and had a gun pointed in her face—marked that "No" "Body Worn Camera Video" existed regarding the incident.[86] Moreover, in that investigation, it was noted that: “Lt. Bruce was on scene." The fact a lieutenant was on the scene, and no body camera footage was available shows that a high ranking officer failed to ensure a subordinate adhered to body camera protocol.[87] Beyond body camera non-compliance the complaint again shows the misclassification of a complaint as

[86] Dckt. 90-5 p. 197-98, App’x Vol. 5, OPS Complaint 18-C-0322-MISC.
[87] *Id.* at 197.

"miscellaneous" despite clearly being another allegation of excessive force.

In OPS file 18-C-0152-MISC it was alleged that a sergeant "refused to provide his name and badge number when the complainant requested the information on 01/21/2018" and inappropriately responded to a citizen during an extra shift.[88] No footage existed from the encounter, and the fact the body camera non-compliance was by a superior officer is further evidence of the *de facto* custom as they are tasked with monitoring body camera compliance.

In OPS 18-C-0341-MISC, a woman alleged an officer failed to take a report concerning a threat made against her—there were <u>two officers</u> on the scene, but the file indicates that no body camera footage was present.[89] When questioned why he did not have his body camera activated, he stated: "I did not believe that this was a formal conversation between Police and Citizen contact."[90] The officer was not disciplined for failing to adhere to body worn camera policy.[91] Here,

---

[88] Dckt. 90-5 p. 150, App'x Vol. 5, OPS Complaint 18-C-0152-MISC.
[89] Dckt. 90-5 p. 223-24, App'x Vol. 5, OPS Complaint 18-C-0341-MISC.
[90] Dckt. 90-5 p. 223, App'x Vol. 5, OPS Complaint 18-C-0341-MISC.
[91] *Id.* p. 226.

Appellant was offered a *quid pro quo* which is in essence a threat similar to the accusation in this complaint.

In 18-C-0405-MISC, a citizen stated: "he was walking down Hill St toward a Baptist church that gave out food" when he was accosted by a police officer in a truck.[92] The investigator noted the officer "did not activate his body worn camera during this incident".[93] Like in Tolston's case, there was no arguable probable cause for the detention.

### b. The OPS Investigations Revealed Officers at All Levels Flouting the Body Camera Policy, Including Superior Officers

To show that the custom was widespread and pervasive, numerous "miscellaneous" investigations revealed officers routinely failed to use their body cameras for all types of interactions which is indicative of the alleged culture of non-compliance.

In OPS file 18-C-0195-MISC, an investigator found: "While speaking to Sergeant Apple, Mr. Hasse ask[ed] him if his body camera was recording, Sergeant Apple said no, but hers is."[94] The OPS investigator wrote: "It was determined during the investigation that

[92] Dckt. 90-5 p. 232, App'x Vol. 5, OPS Complaint 18-C-0405-MISC.
[93] *Id.* p. 235.
[94] Dckt. 90-5 p. 155, App'x Vol. 5, OPS Complaint 18-C-0195-MISC.

Sergeant Apple did violate departmental policies during the incident by not activating his body worn camera when responding to a supervisor request."[95] The fact that a sergeant was flouting policy is indicative of a wider pattern of non-compliance due to the fact supervising officers are tasked with monitoring enforcement of camera protocols.

The OPS investigator in OPS 18-C-0016-MISC, concerning a traffic accident, noted that an officer did not have his body camera activated.[96]

In OPS 18-C-0339-MISC, a sergeant and officer "failed to properly investigate an armed robbery which led to the improper detention and arrest of the complainant on 08/07/2017." There is no mention of body worn footage, the box to indicate the presence of footage was unmarked, and there is no record either officer was disciplined for failing to activate their body camera.[97]

---

[95] Dckt. 90-5 p. 155, App'x Vol. 5, OPS Complaint 18-C-0195-MISC.
[96] Dckt. 90-5 p. 141, App'x Vol. 5, OPS Complaint 18-C-0016-MISC.
[97] Dckt. 90-5 pp. 217, 220, App'x Vol. 5, OPS Complaint 18-C-0339-MISC.

Similarly, in OPS 18-C-0332-MISC an officer was disciplined for prematurely deactivating his body camera during an alleged discourteous interaction responding to a traffic accident.[98]

In OPS 18-C-0405-MISC, concerning alleged bias during a domestic dispute call, the investigator noted an officer belatedly activated his body camera and another officer did not activate theirs at all in stating: "Upon viewing BWC video, only the tail-end of the event was captured. Although another unnamed officer was on scene, no additional video."[99]

#### c. Several OPS Investigations Show the City of Atlanta Did Not Even Equip All Officers With Body Cameras Including the Most Violent Unit

During the OPS investigation 18-C-0488-MISC, in which three SWAT sergeants, one captain, and an officer[100] were all on the scene as not equipped with body-worn cameras—a SWAT officer admitted: "We don't have BWC assigned to the SWAT Unit. I haven't been issued a

[98] Dckt. 90-5 p. 214, App'x Vol. 5, OPS Complaint 18-C-0332-MISC ("BWC footage does not show the transaction between Officer Bradshaw and Ms. Core as it appears to have been turned off prior to their interaction").
[99] Dckt. 90-5 p. 230, App'x Vol. 5, OPS Complaint 18-C-0405-MISC.
[100] Dckt. 90-5 p. 241, App'x Vol. 5, OPS Complaint 18-C-0488-MISC.

BWC[.]"[101] In that case a woman alleged her home was destroyed by the SWAT team.

In OPS complaint 18-C-0325-MISC concerning a traffic stop, the officer answered in the negative when asked "Do you have a City of Atlanta Police body camera assigned to you?"[102] A sergeant was on the scene during the interaction, yet the investigator noted: "No BWC footage"[103] and is another instance of a superior tasked with monitoring compliance engaging in the unofficial policy.[104]

#### d. The Twelve Aforementioned Internal Affair Complaints Document 20 Instances of Body Camera Non-Compliance, Including 7 Supervising Officers

Pursuant to the policy implemented at the time, it required supervisors to "take immediate corrective action when necessary, regarding the use and/ or misuse of BWC equipment, and BWC data/images[.]"[105] Although there are twelve complaints, there are a total of twenty instances where an officer or supervisor on the scene in the complaint was not equipped with a body camera or failed to

[101] Dckt. 90-5 pp. 237-40.
[102] Dckt. 90-5 p. 204, App'x Vol. 5, OPS Complaint 18-C-0325-MISC
[103] *Id.* p. 203.
[104] *Id.*
[105] Dckt. 90-5 p. 81, Shields BWC policy.

properly use the device.[106] The twenty instances of body cam non-compliance in a nine month span of miscellaneous allegations speak for themselves and provided the final decisionmaker chief of police with requisite notice of the *de facto* custom.

**Seven sergeants failing to adhere to policy in a nine-month span** shows the City should have been on notice of the systemic nature of the issue.[107] This is especially true since they were tasked with monitoring their subordinates and there is no telling how many other instances of non-compliance went unreported or unchecked.

Twenty instances of camera non-compliance, with seven of those being sergeants within a nine-month span preceding Tolston's arrest should be sufficient evidence to impugn policymakers with notice of the deficiencies for purposes of establishing municipal liability.

---

[106] See *Jones v. Louisville/Jefferson Cty. Metro Gov't*, 482 F.Supp.3d 589 (W. D. Ky. Aug. 31 2020) ("was the raid on Plaintiff's home a single incident or 20 incidents? On the one hand, it happened at one place at one time. On the other hand, it involved 20 officers, so there were 20 individual decisions to not use a body camera. Once this case reaches the summary judgment phrase [sic], this may not be enough to show a custom. But at this [motion to dismiss] point, it's plausible.")

[107] Dckt. 90-5 pp. 202-05; 237-44 (three sergeants and one officer were not equipped with cameras during the SWAT raid); 216-20; 149-52; 154-55; 197-98.

### ii. The Auditor's Report Provided Statistical Data Showing the Widespread and Pervasive Nature of Body Camera Non-Compliance

In December of 2018, the Atlanta Auditor, Amanda Noble, published a "Performance Audit: Atlanta Police Department Body-Worn Cameras" report.[108] It was commissioned by chief Erika Shields who stated: "We undertook this audit because body-worn cameras enhance the transparency and accountability of interactions between citizens and the police."[109]

The report stated: "The Atlanta City Council approved Resolution No. 16-R-4096 in August 2016, authorizing the police department to procure 1,200 body-worn cameras and video storage from Taser International for $5.6 million."[110]

The district court acknowledged: "Tolston also points to a December 2018 report by the Office of the City Auditor, which found that, in a random sample of 150 BWC videos uploaded by Atlanta police

---

[108] Dckt. 90-5 p. 159, App'x Vol. 5, Noble Auditor's report.

[109] *Id.* p. 160 ("We undertook this audit because body-worn cameras enhance the transparency and accountability of interactions between citizens and the police. The chief of police requested we conduct a performance audit to assess compliance with the department's body-worn camera policy.").

[110] *Id.* p. 166.

officers, only about 30%–46% of the videos complied with department BWC policies on activation and deactivation." The district court also found: "That report did indeed find widespread non-compliance with APD policy on BWCs, and it made recommendations for improvement." (emphasis added)[111]

The report plainly concluded: "**Officers failed to capture two-thirds of the dispatched calls from November 2017 through May 2018**." (emphasis added)[112]

#### a. Officials Failed to Ensure Body Camera Compliance Between November 2016 to May 2018—Preceding Tolston's Arrest

The district court summarily stated that the Noble Auditor's Report "doesn't help Plaintiff on the matter of notice because it was issued two months after the incident in this case."[113]

However, the report was conducted using data from "Between November 2016 and May 2018" and during that timeframe the "compliance team streamed 1,325 videos-less than 1% of the total videos captured from November 2016 to May 2018."[114] The Court should

[111] Dckt. 90-4 p. 185, App'x Vol. 4, Order on SMJ.
[112] Dckt. 90-5 p. 175.
[113] Dckt. 90-4 p. 185.
[114] Dckt. 90-5 p. 175.

acknowledge that the instances of body camera compliance evaluated in the report occurred *prior* to Tolston's arrest by at least five months.

The auditor's office is part of the City of Atlanta so in the light most favorable to Tolston, there was some level of notice regarding the report, whether record, actual, or inquiry. After all, the body camera footage analyzed came from the Atlanta Police Department.

The report noted: ""Supervisors are responsible for ensuring that officers comply with camera policies; however, supervisors reviewed only 2% of all videos uploaded between November 2016 and May 2018."[115]

Thus, policymakers were on actual record notice of their failures and had supervisors ensured compliance by reviewing footage on a periodic basis instead of engaging in the *de facto* custom, the unofficial policy could have been addressed.

Policymakers can not feign ignorance of officers' body camera noncompliance, when policy mandated that supervisors evaluate just that—and report up the chain of command to the police chief. Even

[115] Dckt. 90-5 p. 176.

after the Auditor's report, the City still failed to act which resulted in a shocking increase in violence against citizens the following year.

### C. The Year Following the Auditor's Report Excessive Forced Increased 70% Which Shows a Causal Connection Between Body Worn Cameras and Excessive Force

Upon *de novo* review the Court should find the district court erred in finding that body worn camera policy was not the motivating factor or invisible moving force behind Plaintiff's underlying constitutional injuries because in addition to the OPS complaints: **The number of actual excessive force complaints by citizens against officers of the Atlanta Police Department increased by seventy percent (70%) from 2018 to 2019—the year following the Noble Auditor's Report documenting widespread non-compliance**.[116]

The substantial increase in the number of excessive force complaints from 2018 to 2019 was disclosed in response to a Georgia Open Record Act request.[117]

The shocking increase in the number of allegations of physical violence against citizens makes clear there is a causal connection

[116] Dckt. 90-5 pp. 268-71, Open Records Act on the Use of Force by Atlanta police.
[117] *Id.*

between excessive force and the unofficial policy of improper body camera usage. The figures speak for themselves and the Court should take note.

Simply put, the undeniable statistically significant increase in excessive force complaints further establishes municipal liability because it shows a casual link between body camera usage and the exact type of abuse alleged by Tolston.

### D. The Chief of Police Did Not Update Body Camera Policy Until 2021—After the City of Atlanta Was Sued by Tolston—and Still Has Not Implemented Annual Training Despite Knowledge of Deficiencies

The failure to adequately train officers to use body cameras contributed to the *de facto* custom of non-compliance creating a risk of harm by officer misconduct.[118]

The City of Atlanta did not require annual body worn camera training as Officer Holland's training record shows he completed a four-hour body worn training course on April 19, 2017, the year he became a peace officer, and another two-hour body worn training course on January 21, 2020.[119]

---

[118] *Keith v. DeKalb Cty.*, 749 F.3d 1038, 1047 (11th Cir. 2014) ("Whether a risk of harm is substantial is an objective inquiry.").
[119] Dckt. 90-5 pp. 109-11, App'x Vol. 5, Holland Training History.

Officer Wadsworth completed a four-hour training course on the devices on April 19, 2017, the year he became a police officer, and a two-hour training on February 5, 2020.[120]

As aforementioned the body camera policy in effect at the time of Tolston's arrest was enacted on December 14, 2017, and despite numerous instances of body camera non-compliance—and an expansive report by the City of Atlanta Auditor, the City of Atlanta chief of police did not update body camera policy until 2021.[121]

The updated policy by Chief of Police Rodney Bryant did not include increased training despite the police chief being aware officers were not turning on the body cameras timely.[122] The former chief himself had no body camera training at all—which is further evidence of the City of Atlanta's indifference.[123] The failure of the chief to not require more training could be attributed to a lack of appreciation for

---

[120] Dckt. 90-5 pp. 106-07, App'x Vol. 5, Wadsworth Training History.

[121] Compare *Tolston v. City of Atlanta, et al*, 1:20-CV-04221-SEG, Doc.152-2 pp. 240-57, "updated" BWC policy.

[122] Dckt. 90-6 p. 118, App'x Vol. 6, Bryant depo. 19:14-18

> "Q: What issues were you aware of with regard to adherence to body camera protocol?
>
> A: Officers not turning on their body cameras timely."

[123] Dckt. 90-5 pp. 113-20, App'x Vol. 5, Chief Bryant Training History.

the importance of such training—or in the light most favorable to Tolston, a blatant and intentional disregard for the use of body cameras.

Regarding the activation and deactivation of devices, the report stated: "In training sessions, the compliance team attempts to instill activation and deactivation into officers' muscle memory."[124] Thus, in the light most favorable to Tolston, the Court should acknowledge cementing an action into muscle memory would take more than two training sessions totalling six hours over three years.

The 2018 Auditor's Report further warned that "The [police] department may miss out on opportunities to improve training and identify departmental weaknesses if zone supervisors fail to regularly review videos."[125]

Thus, the refusal of the chief policymaker to implement a more rigorous training protocol contributed to the prevalence of the *de facto* custom which caused Tolston's injuries.

### E. Mayor Keisha Lance Bottoms Only Signed Administrative Orders Concerning Police Reform Following Civil Unrest

[124] Dckt. 90-5 p. 178.
[125] *Id.* p. 183.

Despite actual knowledge of the *de facto* custom and risk of harm associated with the custom—the City of Atlanta, chief of police, and mayor at the time, Kiesha Lance Bottoms, employed a **do nothing** strategy of indifference regarding body cameras, excessive force, and police reform—and only rose to the occasion to act following widespread civil unrest.

After the death of George Floyd in 2020, the United States experienced nation-wide protests that resulted in the states' military national guards being called on protesting citizens to quell the civil unrest.[126] Georgia was one such state where the military was called-in against the people—and in Atlanta, officers used **chemical weapons and potentially lethal projectiles**.[127]

The protests in Atlanta further exploded following a sick Atlanta police officer shooting Rayshard Brooks in the back three times in a fast

---

[126] *George v. Home*, 684 F. Supp.3d 1348, 1348 (N. D. Ga. April 21, 2023) ("In May 2020, following the murder of George Floyd, protests against racial injustice occurred throughout the country….The City passed this curfew order to maintain order in the light of the unrest that had occurred the prior day. City of Atlanta police chief, Defendant Erika Shields, encouraged the Mayor's curfew[.]").
[127] Dckt. 90-5 pp. 247-66, Georgia Open Records response concerning 2020 protests in Atlanta, Ga.

food parking lot on June 12, 2020.[128] In direct response to that civil unrest Mayor Keisha Lance Bottoms signed a series of administrative orders[129] including implementing an emergency curfew[130]

One order mandated spending five million on dash cameras,[131] but none of City of Atlanta's administrative orders required a similar investment in body cameras despite the City of Atlanta's police

[128] *Miller v. City of Atlanta*, 1:21-cv-03752-SDG. (N. D. Ga. 2022) ("On the evening of June 12, 2020, Rayshard Brooks drove his car to the drive-thru lane of a Wendy's fast-food restaurant on University Avenue in Atlanta, Georgia. While waiting in the drive-thru line in his car, Brooks fell asleep…Rolfe then pulled his gun and fired three shots at Brooks's back without warning[.] Neither officer immediately attempted to provide any such [medical] assistance."); See Alsaada v. City of Columbus, 536 F. Supp.3d 216,223 (S. D. Ohio April 30, 2021) ("Protests continued in Columbus throughout early June. Renewed protests began mid-June, particularly after Rayshard Brooks, a 27-year-old Black man-was shot and killed by Atlanta Police Department officers on June 12, 2020.").

[129] Dckt. 90-5 pp. 91-104, administrative orders 2020-18, 2020-17, 2020-28, & 2020-27.

[130] *Pilgrim v. City of Atlanta*, 1:21-CV-2472-TWT (N. D. Ga. Oct. 13, 2023) ("This case arises out of the protests in Atlanta following the murder of George Floyd. At 5:17 p.m. on May 30, 2020, then-Mayor of Atlanta Keisha Lance Bottoms issued Executive Order 2020-9, which declared an emergency and established a city-wide curfew beginning at 9:00 p.m."); *Hassan v. City of Atlanta*, 1:21-CV-4629-TWT (N. D. Ga. June 1, 2022) ("On June 1, 2020, the Plaintiff was photographing protests around Atlanta that broke out in response to George Floyd's murder. Three days earlier, Atlanta Mayor Keisha Lance Bottoms had issued and ordered enforcement of Executive Order 2020-92, which declared a city-wide curfew from 9 P.M. to sunrise for 72 hours. ").

[131] Dckt. 90-5 p. 93, administrative orders 2020-28.

department budget in 2020 being 200 million dollars.[132] When not all offers were equipped with body cameras, failing to delegate funds for the devices is evidence of blatant indifference despite knowledge of their importance.

**4. The Court Erred When It Held That Tolston Failed to Establish Single Event *Monell* Liability Despite the Blatantly Obvious Need For Training Because at Least Ten Officers Improperly Used Their Body Cameras During Tolston's Arrest in Detention**

Upon *de novo* review, the Court should find that the district court erred when it failed to find single-event municipal liability existed because at least ten (10) officers engaged in body camera non-compliance during the arrest and detention of Tolston. In fact, not one single officer on the scene used their body camera properly. Tolston asserts this systemic failure shows that there is a patently obvious need for body camera training as all officers engaged in the *de facto* custom *en masse* during Tolston's arrest.

[132] Dckt. 90-5 pp. 133-38, Atlanta police 2020 budget and 2021 projected expenses.

"Under certain circumstances, [a] law enforcement agency's failure to adequately train its officers may constitute a `policy' giving rise to governmental liability."[133]

In *Underwood v. City of Bessemer*, Underwood claimed "that the City should be subject to *Monell* liability because it failed to adequately train the Officers [because] Officers arrived on the scene in 'cowboy mode'—under the impression that everyone is a suspect [and] caused the use of unlawful deadly force."[134] Underwood contended: "that had the City adequately trained the Officers, they would not have employed this 'cowboy mode' mentality [and] that the City and Rutledge should be held liable under a theory of ratification."

In declining to find single event liability, this Court in *Underwood* held: "To prove failure to train, Underwood would have had to provide some evidence of a pattern of improper training and show that the City was aware of the deficiencies in its program."[135]

---

[133] *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir. 1991).
[134] *Underwood v. City of Bessemer*, 11 F.4th 1318, 1333 (11th Cir. 2021); See *Oklahoma City v. Tuttle*, 471 U.S. 810, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. ").
[135] *Underwood*, 11 F.4th 1333 (cleaned up & quotations omitted).

Here, the court held: "Tolston briefly argues that this is one of the rare instances in which 'a single event can show the need for training' because it is 'blatantly obvious.'"[136] The court continued: "[t]he Supreme Court has hypothesized a single example of this rare situation: a municipality's failure to train officers about the constitutional limits on the use of deadly force with knowledge that those officers will be armed and expected to use those weapons in the course of their duties [and] The use of deadly force is not at issue in this case."[137]

### A. Officers Wadsworth and Holland Failed to Activate Their Body Prior to Their Interaction With Tolston and Therefore Failed to Capture the Use of Force

Officers Wadsworth and Holland both engaged in the belated activation of their body camera and the premature deactivation of the device for which they received a slap on the wrist.[138] Due to the belated

[136] Dckt. 90-4 p. 188 n. 61, Order or SMJ.

[137] *Id*; See *Simmons v. Bradshaw*, 879 F.3d 1157, 1168 (11th Cir. 2018) ("Without competent evidence establishing a pattern or practice of constitutional violations, Stephens' shooting must be evaluated as a single incident."); See *Pembaur v. City of Cincinnati*, 475 U.S. 471, 502 n. 5 (1986) ("once a municipal policy is established, 'it requires only one application . . . to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.'" (quoting *Tuttle*, 471 U.S. 822)).

[138] Dckt. 90-5 p. 68, OPS memorandum regarding Tolston's complaint.

activation the use of force or arrest were not captured.[139] This fact can not be understated and must not go lost on the Court. In the light most favorable to Tolston, any perceived impairment to Tolston's faculties was due to having just suffered a head injury that was so severe it caused the loss of consciousness.

Moreover, due to the belated activation and the failure to capture the use of force, the officers were not disciplined for the use of excessive force itself. In support of the causation element, a jury could find that officers would routinely fail to activate their body cameras to spoliate evidence regarding an allegation in order to later be exonerated of the more serious offense while receiving little, if any, punishment for body camera violation.

### B. Two Officers Standing in the Vicinity of Tolston Did Not Adhere to Body Camera Protocol

At the time officers engaged in the use of excessive force against Tolston, Officer Thaddeus Joseph and a still unknown female officer were on the scene.[140] However, body camera footage from them is non-existent. Their noncompliance demonstrates two more examples of

[139] Doc. 168, Pl's Exh. 11 - 18.
[140] Doc. 168, Wadsworth BWC 1 Pl. Exh. 11 at :00-35.

the unofficial policy at work. Had they properly activated their devices, the use of excessive force and preceding events could have been captured.

### C. Four Officers at the Pavillion Where Tolston Was Detained Were Not Even Equipped With a Body Camera Despite Policy That Required Officers Use the Devices During Extra Shifts

Beyond the four instances of improper usage by the arresting officers—the fact that six officers on the night of Tolston's arrest were not equipped with body cameras shows there was a blatantly obvious need for training as policy mandated that the devices be worn for extra and regular shifts.

On October 14, 2018, at least six officers were not even equipped with body worn cameras entirely.[141] Footage shows four (4) officers seated at a table inside the Piedmont Park Pavilion while Appellant was in custody—and none of the officers were equipped with body cameras.[142]

---

[141] Doc. 168, Wadsworth BWC 2, Pl. Exh. 12 at :00 - 08; Pl. Exh. 11 at :01-:03, 2:11.

[142] *Id.* at :00 - 08, Wadsworth BWC 2, Pl's Exh. 12.

Thus, all detentions at the pavilion that night would represent separate instances of non-compliance and the potential loss of ***Brady*** **evidence**.[143]

### D. Two Superior Officers Engaged in Blatant Body Camera Malfeasance While Not Ensuring Subordinates Adhered to Policy

Body camera footage shows two superior officers engaged in body camera non-compliance as part of the *de facto* custom, despite the policy requirement that they supervise subordinates' compliance.

First, video footage shows Wadsworth tell someone who appears to be a superior that he "had to slam" Tolston. The superior officer did not use a body camera device as no footage was disclosed from him.[144]

---

[143] Doc. 168, Wadsworth BWC 1, Pl. Exh. 11 at 2:11; Aside: Appellees argue there is no constitutional right to body camera footage; however, the longheld and clearly established duty to preserve exculpatory evidence must extend to body camera evidence or else there would be no reason for the Georgia legislature to mandate its preservation.

[144] Doc. 168, Wadsworth BWC 1, Exh. 11 at 0:22-24; Aside, While Appellee Battle did not play a significant role, Appellant does not object to his grant of summary judgment; however, the same does not hold true for Appellee Walton because he actively played a part in the cover-up by not holding officers accountable for the use of force—-and by scapegoating Wadsworth by disciplining him for failing to advise a superior officer of the use of force against Appellant, despite body camera footage showing him do so **twice**. Therefore, a jury could find him liable as part of the cover-up and his testimony will be vital at trial.

Second, the superior officer who told Officer Wadsworth: "Let me talk to him over here", who offered a *qui pro quo*, did not use a body camera.[145] At that time, Wadsworth's body worn camera captured Holland prematurely deactivate his body worn camera.[146] Wadsworth's body camera footage also abruptly ends moments after as his hand is seen coming into the frame, presumably to prematurely deactivate the device.[147]

The Court should reason that the failure by the superior officers to use their devices—and the failure to encourage Wadsworth and Holland to ensure their devices remained activated—was a deliberate attempt to cover-up what transpired. The fact the conduct was exhibited by superior officers makes the malfeasance a strong showing of how pervasive the unofficial policy of noncompliance was—and should be sufficient evidence to establish single incident liability because the need to train was blatantly obvious at all levels.

### E. The Premature Deactivation of Officers' Body Cameras Prevented Capturing the *Quid Pro Quo*

[145] Doc. 168, Wadsworth BWC 1, Exh. 11 at 3:58–4:01.
[146] *Id.* at 4:04–06.
[147] *Id.*

A jury could reasonably find that had officers not prematurely deactivated their body cameras Tolston would not have been given a *quid pro quo* by a superior officer because officers would have known their actions were being recorded. The premature deactivation to conceal malfeasance clearly shows how body camera non-usage is tied to the injuries Tolston suffered bolstering the causal connection between the policy and constitutional harm.

Therefore, the single event of Tolston's arrest did not represent merely one incident of body camera non-compliance by the pair, because the two arresting officers engaged in four incidents of noncompliance: 1) the failure by both to capture the use of force; and 2) the premature activation by both to conceal the *quid pro quo*.

Thus, the Court should find Tolston has shown a triable issue of fact regarding the nexus between the officers' conduct, Appellant's injuries, and the non-use and improper use of body camera devices.

### F. Ten Officers Engaged in Body Camera Noncompliance Which Demonstrated a Blatantly Obvious Need for Training

The two officers part of Tolston's arrest, the two officers who were in the immediate vicinity of the use of excessive force, the two

supervisors who were on notice of the use of force after the arrest, and the four officers seated at the table in the pavilion show that the City of Atlanta had such a serious problem with body camera non-compliance such as to show the need for training was blatantly obvious.

In accord with *Tuttle* and *Underwood*, the Court should find that a jury could reasonably determine that the actions of the officers regarding the unofficial policy show a blatantly obvious need for training—whcih could have plausibly been the moving force that caused Tolston's injuries.

### G. The Additional Ten (10) Instances of Body Camera Non-Compliance Coupled with the 20 Instances from the OPS Investigations Should Result in a Finding of Municipal Liability

In the event that the Court is unpersuaded to find that the body camera failures by at least ten officers on the night of Appellant's arrest is sufficient to rise to the level of single-event municipal liability—under the totality of the circumstances—and against the backdrop of the twenty other officers that failed to adhere to policy in the OPS investigations, the Court should find a *de facto* custom was the moving force behind Tolston's injuries.

Collectively, Tolston has identified at least 30 instances of body camera non-compliance from January 1, 2018, to October 14, 2018.

Moreover, the evidence shows that officers engaged in a wide range of misconduct while their devices were not activated in line with the culture of lawlessness created by the grossly negligent failure of policy-making officials to hire, train, supervise, and discipline officers—-and staff and fund internal affairs.

The failure on the front end regarding a failure to record interactions with citizens by body cams was exacerbated on the back end by the understaffing and underfunding of the office of Professional Standards, which was tasked with investigating allegations of misconduct.

**5. The District Court Erred When It Held Tolston Did Not Establish Municipal Liability Regarding the Failure to Hire, Train and Supervise Officers and Internal Affairs**

Upon *de novo* review, the district court erred when it found that Tolston did not establish an independent claim for municipal liability regarding the failure to hire, train, supervise, and discipline officers via the underfunding and understaffing of the Office of Professional Standards.

The district court stated Tolston "seeks to hold the City liable for its budgetary practices [and] He alleges that the City intentionally "hobbl[ed]" OPS by understaffing it, thus creating a backlog that was intended to prevent the timely investigation of complaints against officers."[148] (emphasis added) However, the Court held "Tolston 'does not identify any 'pattern of injuries' linked to [the City's] budgetary decisions[.]"[149]

The court held "a municipality's liability 'cannot be dependent on the scant likelihood that its budget decisions would trickle down the administrative facets and deprive a person of his constitutional rights[,] liability must be premised on a finding that 'this' budget decision was 'highly likely to inflict the particular injury' [plaintiff] suffered."[150]

The court opined: "To 'test the link' between a plaintiff's injury and the municipality's budgetary decision, a court should look to whether the City 'should have known that plaintiff's injuries were a

---

[148] Dckt. 90-4 p. 187 n. 60.

[149] *Id.* (citing *McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004) (quoting *Bd. of Cty. Comm'rs of Bryan City v. Brown*, 520 U.S. 397, 408 (1997))).

[150] *Id.* (citing *McDowell*, 392 F.3d 1292 (quoting *Brown*, 520 U.S. at 412)).

plainly obvious consequence of that decision.'"[151] After setting that framework, the district court concluded: "Here, Plaintiff has made no such showing."[152]

In *McDowell v. Brown*, the Plaintiff was required to prove "DeKalb's policy was to understaff the field division, and that this practice left the division unable to execute medical transports."[153] But "Although McDowell produced evidence that the Jail had staffing problems, the record provides no evidence that the field division consistently failed to transport non-emergency cases to Grady."[154]

In order to succeed, the court ruled that McDowell had to show "The County must have a deliberate intent to inadequately staff the field division." However, the "isolated incident [did] not demonstrate evidence of the County's 'persistent' or 'widespread' policy of understaffing the Jail so as to delay the transfer of inmates to Grady."[155]

---

[151] Dckt. 90-4 p. 187 n. 60 (quoting *McDowell*, 392 F.3d 1292 (clean up & internal quotations omitted)).
[152] *Id.*
[153] *McDowell*, 392 F.3d 1285.
[154] *Id.* at 1290.
[155] *Id.* at 1291.

Ultimately, the court held the county "had no notice of the consequences 'based on previous violations of federally protected rights.'"[156]

### A. The City of Atlanta's Office of Professional Standards Had Only Five (5) Investigators to Conduct Investigations Into Nearly 2000 Atlanta Police Officers Which Clearly Shows a Failure to Hire Staff and Fund Internal Affairs

The court erred in finding that Tolston did not show a "pattern of injuries" tied to the understaffing of the Office of Professional Standards coupled with non-use of body cameras.

The Supreme Court has acknowledged: "More sensible staffing practices, better training, or a more rigorous tracking procedure may have averted the deprivation at issue [and] the State knew the exact context in which the wrongful deprivation would occur."[157] When staffing levels are not "minimally adequate" a court may find liability for a failure to hire.[158]

In *Anderson v. City of Atlanta*, a woman died after not being checked on due to understaffing, and in that case, the night shift

---

[156] *McDowell*, 392 F.3d 1292 (quoting *Brown*, 520 U.S. 408).
[157] *Zinermon v. Burch*, 494 US 113, 145 (1990).
[158] *Hensley v. Eckerhart*, 461 US 424, 427 ("With respect to staffing, the sixth general area, the District Court found that the Forensic Unit's staffing levels, which had increased during the litigation, were minimally adequate.").

commander the infamous Fulton County Jail "stated she had received complaints from officers on her shift regarding the understaffing and that she had spoken to her supervisor about the need for more personnel and that she finally quit asking."[159] The Court noted in *Anderson*: "The shortage of staff, according to Smith, made it impossible to check on the detainees every half-hour as required [and] he had complained about understaffing at the Pre-trial Detention Center but felt that 'it was like a voice crying in the wilderness.'" (emphasis added)[160]

Here, in 2018, the City of Atlanta had 1,761 uniformed officers,[161] but in December of 2021 at the time of depositions, Appellee Walton testified OPS only had five investigators.[162] Although Walton did not testify to the number of investigators in 2018, in the light most favorable to Tolston, the number of investigators in 2018 was comparable to the number in 2021—and can be ascertained at trial.[163]

---

[159] *Anderson v. City of Atlanta*, 778 F.2d 680, 683 (11th Cir. 1985).
[160] *Id.*
[161] Dckt. 90-5 pp. 159-95, Noble Auditor's Report
[162] Dckt. 90-6 p. 168, Walton dep. 26:1-4.
[163] *Cantu v. City of Dothan, Alabama*, 974 F. 3d 1217, 1222 (11th Cir. 2020) ("the facts at this stage are what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party who was opposing summary judgment").

Only five investigators is patently deficient in its face and should move the Court to find a failure to hire and fund internal affairs.

### B. Evidence Shows It Was Nearly Impossible for the Investigations by Internal Affairs To Complete Investigations Within 180 Days

The understaffing and underfunding of internal affairs made it nearly impossible for investigators to timely complete investigations.

Unlike in *McDowell*, Tolston is not relying on a single case. The police chief testified investigations were to be completed within 180 days to be considered done in a "timely manner."[164] In analysis of the twelve OPS complaints of body camera non-compliance—**only two (2)**—were completed within a 180-day timeframe. This is clear evidence to show that the Office of Professional standards was understaffed as they could not perform their basic function timely.

| OPS Investigation | App'x page number[165] | Open Date | Close Date | Days |
|---|---|---|---|---|
| 18-C-0016-MISC | 90-5 p. 141 | 1/11/18[166] | 8/27/18 | 228 |

[164] Doc. 153-2, Bryant, 32:22-24.
[165] The "App'x page number" field identifies the page in Volume 5 of the Appendix on which the OPS investigations can be found.
[166] Dckt. 90-5 p. 75, document disclosed by the City of Atlanta showing the open dates for the OPS cases.

| | | | | |
|---|---|---|---|---|
| 18-C-0152-MISC | 90-5 p. 150 | 3/5/18[167] | 11/6/18 | 246 |
| 18-C-0195-MISC | 90-5 p. 155 | 4/2/18[168] | 10/17/18 | 198 |
| 18-C-0332-MISC | 90-5 p. 213 | 6/30/18[169] | 1/3/19 | 187 |
| 18-C-0339-MISC | 90-5 p. 217 | 7/3/18[170] | 3/12/19 | 252 |
| 18-C-0341-MISC | 90-5 p. 223 | 7/3/18[171] | 6/6/19 | 338 |
| 18-C-0405-MISC | 90-5 p. 228 | 8/1/18[172] | 3/11/19 | 222 |
| 18-C-0462-MISC | 90-5 p. 231 | 8/29/18[173] | 7/19/19 | 324 |
| 18-C-0488-MISC | 90-5 p. 241 | 9/19/18[174] | 6/20/19 | 274 |

The data speaks for itself. It shows that ten out of the twelve internal affairs investigations—or eighty-three (83) percent, were not adjudicated within 180 days and demonstrates an undeniable pattern of understaffing and underfunding on its face because the office was unable to timely fulfill its mandate. There is no generalized budgetary claim here as with more money, the office would have hired more investigators. The Atlanta police budget shows the police capacity to hire more investigators to better staff internal affairs, but chose not to.

[167] Dckt. 90-5 p. 75
[168] *Id.*
[169] *Id.*
[170] *Id.*
[171] *Id.*
[172] *Id.*
[173] *Id.* at p. 78
[174] *Id.*

### C. The Police Chief and Investigator Walton Testified That Hiring More Investigators Would Have Allowed Investigations to be Conducted More Timely

The police chief and an OPS investigator testified of the need for more investigators. Appellee Walton, testified "I don't have knowledge of that" when asked how many investigators would be needed to complete investigations within the 180-day timeframe.[175]

Chief Bryant answered in the affirmative when asked if more investigators would allow the completion of investigations in 180 days—although he "could not define an absolute number," that would be needed to fulfill that timeframe.[176]

Unlike in *Anderson*, where sixteen officers staffing a single jail at night when twenty-five were needed was deficient: Here, City of Atlanta's deliberate indifference is so blatantly obvious that no one knows how many investigators would be needed to adequately provide the vital societal check on officers' authority.

### D. Despite the Acknowledged Need for More Investigators, the Chief of Police Advised That None of 250 Proposed Additional Officers Would Be Assigned to Internal Affairs

[175] Dckt. 90-6 p. 172, Walton dep. 8:4-7 & 26:1-21.
[176] Dckt. 90-6 p. 141, Bryant dep. 109:25 to 110:1-11.

For "1983 liability based on a hiring decision, a plaintiff must demonstrate that the municipal actor disregarded a known or obvious consequence of hiring."[177]

In *West v. Tillman*, "Plaintiffs submitted evidence that the Supervisory Defendants were aware of serious understaffing problems at the Jail."[178] However, this Court noted "the record also reflects that the Supervisory Defendants did not fail to act to address the problem [so] No evidence suggests the [policymaker] was deliberately indifferent to the staffing problems or that he failed to take corrective action."[179]

Here, in 2020, the Atlanta mayor consulted the police chief on hiring an additional 250 officers—however, none of the additional 250 officers would go to staffing OPS."[180]

Thus, despite knowledge of a staffing deficiency, the inability to timely complete investigations, and the need for greater

---

[177] *Griffin v. City of Opa-Locka*, 261 F.3d 1298, 1305 (11th Cir. 2001) (holding "Although we are unaware of any cases directly on point, we believe our conclusion [i]s supported by several cases where state employees were held to be acting under color of law when they utilized their authority to create the opportunity for or to facilitate a sexual assault.").
[178] *West v. Tillman*, 496 F.3d 1324, 1329 (11th Cir. 2007).
[179] *Id.*
[180] Dckt. 90-6 p. 141; Bryant dep. 109:18-23

accountability—the policymakers intentionally understaffed the only office tasked with ensuring that complaints of abuse by officers were investigated timely.

The financial wherewithal to hire 250 officers shows that the City could afford to place a dozen more investigators at OPS—but they chose not to. Thus, policymakers were indifferent and grossly negligent toward the understaffing and underfunding of OPS—thereby ratifying the increased likelihood for misconduct and abuse of citizens.

A jury could find that the failure to hire officers, specifically for OPS, created a substantial risk of harm to the public by creating complaint backlogs which allowed officers to go an unreasonable period of time without consequences related to misconduct. Therefore, the Court should find the district court erred when it granted summary judgement on Tolston's failure to hire, train, and supervise claim.

### 6. The District Court Erred in Finding That "Wadsworth Was Acting Within the Scope of His Discretionary Authority"

The standard of review is *de novo* for a court evaluating the determination whether an officer was operating in their discretionary authority. Keith Wadsworth is not entitled to qualified immunity on any of Tolston's claims because he failed to receive approval to work the

extra shift at the festival; was unauthorized to act in a police capacity; and plainly acted outside the scope of a reasonable officer.

Citing *Richmond v. Badia*, the district court noted: "To receive qualified immunity, a government official 'must initially establish that he was acting within his discretionary authority when the alleged wrongful acts occurred.'"[181] The court acknowledged that Tolston: "argues that Officer Wadsworth did not act within his discretionary authority when he allegedly violated Tolston's constitutional rights."

However, the Court concluded "Wadsworth was acting within the scope of his discretionary authority when the allegedly Unconstitutional conduct occurred"[182]

Here, Wadsworth was disciplined for failing to get approval to work the extra job at the festival.[183] It is not within an officer's discretion to retaliate against a party that they are actively releasing due to a request for their badge number.

Moreover, an officer is not operating within their discretionary authority when they maliciously file three charges against a party due

---

[181] Dckt. 90-4 p. 119 (citing *Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022)).
[182] *Id.* at 122.
[183] Dckt. 90-5 p. 68, OPS Memorandum from Tolston's complaint

to engaging in protected speech in the form of requesting their badge numbers when they had never cited someone with all three of the ordinance offenses stemming from a single incident.

Thus, the Court should hold that the district court erred as a matter of law when it ruled that Keith Wadsworth was operating within his discretionary authority as a police officer, because that discretion does not include violating policy, unlawfully retaliating for protected speech, or using animus to maliciously prosecute a citizen. Therefore, Wadsworth would not be entitled to qualified immunity on at least those two claims and the court thereby erred.

**7. The District Court Committed Clear Error By Failing to Take Judicial Notice of the Population of the City of Atlanta**

When alleging municipal liability the Court requires a Plaintiff to provide context such as a city's population, and the number of sworn officers. [184]

[184] See *Davidson v. City of Stafford, Tex*, 848 F.3d 388, 396-97 (5th Cir. 2017) ("Without further context of the size of Stafford PD or the amount of arrests made over the corresponding period, these incidents are insufficient to establish a pattern of constitutional violations by the Stafford PD."); *Williams v. Borough of West Chester, PA*, 891 F.2d 459, 461 (3rd Cir. 1889) ("At the time of the incident, West Chester had a population of over 18,000 people, and a thirty-five member force is not tiny."); *Tillson v. Forrest City Police Dep't*, 28 F.3d 804, 816 (8th Cir. 1994)

On review, a district court's failure to take judicial notice is reviewed for an abuse of discretion using the clearly erroneous standard.[185]

Tolston filed a motion for "the court to take judicial notice of the population of the City of Atlanta as the fact is relevant to Plaintiff's claims of Monell liability."[186]

Tolston stated: "According to the most recent updated 2020 census, the population of the City of Atlanta was 498,715 and in 2010 the population was 420,003.20 [Att. F] The fact is relevant to Plaintiff's claims of Monell liability by providing context to the number of recorded interactions compared to the size of the population."[187]

---

("The City of Forrest City, Arkansas, has 13,364 occupants. 1990 Census of Population [thus] It is a reasonable inference that the Chief of Police in a small community would be aware of who was arrested, why he or she was arrested, and the status of each defendant."); *Coogan v. City of Wixon*, 820 F.2d 171, 171 (6th Cir. 1987) ("Plaintiff had a number of problems with the City of Wixom, a suburb of Detroit with a population of approximately 7500.").

[185] *Bryant v. Ford*, 967 F.3d 1273, 1275 (11th Cir. 2020) ("We review for an abuse of discretion 'a district court's decision to take judicial notice of a fact.'" (citing *Paez v. Sec., Fla. Dep't Corr.*, 947 F.3d 650, 651 (11th Cir. 2020))).

[186] Dckt. 90-4 p. 36.

[187] *Id.*

Tolston attached a copy of the census data along with Appellant's motion to supplement the record.[188]

However, in the court's order declining to take judicial notice of the population, the court wrote: "The facts listed above each concern extraneous matters, matters that post-date Tolston's arrest, or general grievances against city management unrelated to this case. In a legal sense – and this is a legal proceeding – none is relevant"---thus the court clearly erred.[189]

### 8. The District Court Erred When It Granted Summary Judgment on Tolston's First Amendment Retaliation Claim

Upon *de novo* review, the Court should find the district court erred in granting summary judgement for Tolston's First Amendment retaliation claim.[190]

The law is well settled that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for

---

[188] Dckt. 90-4 p. 18-19

[189] Dckt. 90-4 p. 193.

[190] *Williams v. Radford*, 64 F4th 1188, 1188 (11th Cir. 2023) ("Summary judgment is warranted when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party.") (internal quotations omitted).

speaking out."[191] Moreover, "Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right."[192] Even those confined to prisons have the right to uncensored communications.[193] In order to succeed on a First Amendment retaliation claim, a plaintiff must show: 1) engagement in constitutionally protected speech, 2) "adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech," and 3) a causal connection between the protected speech.[194]

The First Amendment retaliation against Tolston is quite obvious and straightforward.

### A. Tolston's Request for "Everyone's Badge Number" Was Protected Speech and Lawful Pursuant to an Active Consent Decree

First the district court noted that after Tolston was "'slammed on the ground' [and] lost consciousness". The court then noted that Tolston "was then handcuffed and detained."[195] When evaluating the retaliation claim the court noted: "the BWC footage appears to show that Officer

---

[191] *Hartman v. Moore*, 547 U.S. 250, 256 (2006).
[192] *Id.*
[193] *Benning v. Comm'r, Ga. Dep't of Corr.*, 71 F. 4th 1326, 1329 (11th Cir. 2023.
[194] *Brannon v. Finkelstein*, 754 F.3d 1269, 1274 (11th Cir. 2014).
[195] Dckt. 90-4 p. 140.

Holland was on the verge of releasing Tolston, but that Holland changed his mind after Tolston asked for badge numbers."[196]

Using the factors outlined in *Brannon*, Tolston requested the badge number of officers three times and Tolston stated that it was Tolston's intention to sue. In response Tolston's liberty was again restrained.[197] The court noted: "The footage further shows Tolston repeating three times, 'I just need everyone's badge numbers.' [and] Holland replied, 'Nah, he's gonna take a ride, come on, you're gonna take a ride.' (Id. at 1:50–55)"[198]

Moreover, the request for badge numbers, which was not answered, violated the consent decree in *Calhoun v. Pennington*—which was active and in effect at the time the request was made[199] and may be

[196] Dckt. 90-4 p. 171; See Doc. 168, Wadsworth BWC 1, Pl. Exh. 11 at 0:20–2:00.
[197] See *Davis v. Williams,* 451 F.3d 759, 767 (11th Cir. 2006) ("Nor can a citizen be precluded by the threat of arrest from asking to speak to an officer's superior or from asking for an officer's badge number. Those inquiries likewise do not constitute obstruction of justice or disorderly conduct.").
[198] Dckt. 90-4 p. 98 (citing Doc. 168, Wadsworth BWC 1, Pl. Exh. 11 1:35–55).
[199] *Calhoun*, 1:09-cv-03286.

a sign of guilt.[200] Nevertheless, the badge number request and intent to sue statement were protected First Amendment speech, which satisfies the first element of the retaliation claim.

B. Officer Prolonging Tolston's Detention for at Least Sixteen Minutes Was a Fourth Amendment Violation and Adverse Action

Turning to the second element of "adverse action" or injury: In response to Tolston's protected speech, Lawrence Holland stated, "He's gonna take a ride" and reapplied the handcuffs.

The district court noted this series of events in stating: "The video footage shows Holland, not Wadsworth, re-applying the handcuffs to Tolston's right wrist after Tolston asked for badge numbers."[201]

Regarding the second element of adverse action, threatening Tolston with "a ride" and re-applying handcuffs to prolong the detention was an adverse action. Wadworth took part in the prolonged detention

[200] *Hiibel v. Sixth Jud. Dist. Ct. of Nev. Humboldt Cty.*, 542 U.S. 180, 190 (2004) ("In this case petitioner's refusal to disclose his name was not based on any articulated real and appreciable fear that his name would be used to incriminate him, or that it "would furnish a link in the chain of evidence needed to prosecute" him.").
[201] Dckt. 90-4 p. 172.

which constituted an adverse action because prolonging a seizure can constitute a Fourth Amendment Constitutional violation.[202]

However, the court ruled: "It cannot reasonably be said that Plaintiff was arrested in retaliation for his words, for the footage makes clear that Tolston was already in handcuffs when he asked for badge numbers[.]"[203] The fact it was Lawrence Holland that re-applied the cuffs, does not decrease the liability of Keith Wadsworth as the court insinuates because in the light most favorable to Appellant, they acted in concert as joint tortfeasors.

Whether Tolston was in cuffs or not, it is undisputed that Tolston was being released. Therefore, even if Wadsworth intended to cite Tolston for the same three offenses at the time of being released, prior to the request for badge numbers—Wadsworth allowed Tolston to be restrained again following the protected speech—which undeniably prolonged the detention.

---

[202] *Alcocer v. Mills*, 906 F.3d 946, 954 (11th Cir. 2018) (holding "This fact pattern potentially presents two possible rights as candidates for driving our analysis: (1) the Fourth Amendment right to be free from unreasonable seizures, *Case v. Eslinger*, 555 F .3d 1322, 1326 (11th Cir. 2009), and 2) the Fourteenth Amendment due-process right to be free from continued detention after law enforcement should have known that the detained person was entitled to release." ).

[203] Dckt. 90-4 p. 171.

### 9. The District Court Erred In Granting Summary Judgment on Tolston's Malicious Prosecution and Abuse of Process Claim By a Misapplication of Law In Holding "To Prevail on His Malicious Prosecution Claim, He Must Present Evidence That He was subject to a "Seizure Following an Arraignment, Indictment, or Probable-cause Hearing"

Upon *de novo* review, the district court erred in ruling that Wadsworth was entitled to qualified immunity regarding Tolston's malicious prosecution and abuse of process claim because there was a misapplication of the law and officers indeed used animus for Tolston's protected speech to cite Tolston for three city ordinance offenses.[204]

Quoting *Luke v. Gulley*, the court stated that malicious prosecution claim has two elements: "(1) 'the defendant violated [the plaintiff's] Fourth Amendment right to be free from seizures pursuant to legal process' and (2) 'the criminal proceedings against [the plaintiff] terminated in his favor.'"[205] This appears to be a misapplication of the law based on precedent set by the Supreme Court.

Count XV of the original complaint was styled as "Abuse of Process and Malicious prosecution Cognizable Under 42 U.S.C. 1983 in

---

[204] *Powell v. Snook*, 25 F. 4th 913, 920 (11th Cir. 2022) ("We review *de novo* a grant of summary judgment based on qualified immunity, construing the facts and drawing all inferences in the light most favorable to the nonmoving party.")

[205] Doc. 237 p. 84 (quoting *Luke v. Gulley*, 50 F.4th 90, 95 (11th Cir. 2022)).

Vi[o]lation of the Fourth and Fourteenth Amendments Against All Defendants", thus whether the cause of action is analyzed as an abuse of process claim or malicious prosecution, the Court erred when it held Wadsworth was entitled to summary judgment.[206]

The Supreme Court has recently held; "to succeed on such a claim, a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person."[207]

In *Chiaverini v. City of Napoleon*, the "The constitutional violation alleged in such a suit is a type of unreasonable seizure—an arrest and detention of a person based on a criminal charge lacking probable cause."[208] The Supreme Court continued that under the Fourth "Amendment, a pretrial detention (like the one Chiaverini suffered) must be based on probable cause [or] Otherwise, such a detention counts as an unreasonable seizure."[209] So the Supreme Court reasoned: "even when a detention is justified at the outset, it may become unreasonably prolonged if the reason for it lapses."[210]

---

[206] Dckt. 90-1 p. 114, original compl.
[207] *Chiaverini v. City of Napoleon, Ohio*, 144 S. Ct. 1748, 1748 (2024).
[208] *Id.* at 1750.
[209] *Id.*
[210] *Chiaverini*, 144 S. Ct. 1748

Justice Kagan then hypothesized a situation that bears a striking resemblance to the facts of the case at bar in stating: “if an invalid charge—say, one fabricated by police officers—causes a detention either to start or to continue, then the Fourth Amendment is violated. And that is so even when a valid charge has also been brought”.[211] Also, the Court noted “it was no defense that there was probable cause for part of the prosecution." (emphasis added)[212]

Regarding abuse of process, the Supreme Court has held that “Cognizable injury for abuse of process is limited to the harm caused by the misuse of process”[213]

Here, like the Supreme Court hypothesized *Chiaverini*, Tolston maintains that officers fabricated charges against Tolston to falsely arrest Tolston after officers prematurely engaged in a Fourth Amendment violation. Thus, the malicious prosecution and abuse of process came into play when officers then used retaliatory animus to cite Tolston with three offenses despite lacking probable cause.

---

[211] *Id.* at 1751.
[212] *Id.* (cleaned up & quotations omitted)
[213] *Heck v. Humphrey*, 512 U.S. 477, 503 n. 8 (1994).

### 1. Wadsworth Is Not Entitled to Summary Judgment on Tolston's Malicious Prosecution and Abuse of Process Claim

Whether an arrest and retaliatory prosecution is better cognizable as malicious prosecution or an abuse of process is an open question that could be argued both ways as the Supreme Court recently held: "in this instance we could debate whether the closer common-law analog to retaliatory prosecution is malicious prosecution (with its no-probable-cause element) or abuse of process (without it)."[214]

Here, the district court noted: "When the officers and Tolston neared the park exit, Wadsworth told Tolston, 'Do not come back in this park.'"[215] The court then observed: "Tolston said, 'This is crazy. I just need everyone's badge numbers.'"[216]

The district court observed "footage further shows Tolston repeating three times, 'I just need everyone's badge numbers.'"[217] The court then noted: "Holland replied, 'Nah, he's gonna take a ride, come on, you're gonna take a ride.' [and] Holland took hold of Tolston's right

[214] *Hartman*, 547 U.S. 258.
[215] Dckt. 90-4 p. 97. (citing Wadsworth BWC 1, Pl. Exh. 11 at 1:20–23).
[216] *Id.* (citing Wadsworth BWC 1, Pl. Exh. 11 at 1:35–50).
[217] *Id.*

arm and reapplied the handcuffs.[218] Wadsworth, along with Holland, "took Tolston to an indoor park pavilion [and] Wadsworth then issued a citation to Tolston and released him."[219] Ultimately the district court noted Tolston "was cited for: (1) being disorderly under the influence (ATLANTA, GA., CODE § 10-9), (2) prohibited conduct in a park (id. § 110-59), and (3) obstruction (id. § 106- 81.7) [and] The charges were later dismissed."[220]

The court ruled: "that under the applicable law, this claim cannot proceed to the jury, for Tolston has not shown the existence of any seizure pursuant to legal process in this matter."[221] The court held: "there is no evidence that any seizure occurred after the commencement of the state judicial proceeding [because] Being summoned to attend a criminal proceeding, without more, is not a 'seizure' within the meaning of the Fourth Amendment."[222]

The district court then asserted: "Tolston's complaint styles his § 1983 malicious prosecution claim as one for 'abuse of process and

---

[218] Dckt. 90-4 p. 97 (citing Wadsworth BWC 1, Pl. Exh. 11 at 1:50–55).
[219] *Id.* (citing Wadsworth BWC 2, Pl. Exh. 12, Tolston Dep., Doc. 149-1 at 87:23–88:3).
[220] *Id.*
[221] *Id.* p. 175 (internal quotations omitted).
[222] *Id.*

malicious prosecution' [and] Plaintiff makes no mention of any distinct abuse of process claim in the summary judgment briefing [so] To the extent that Plaintiff sought to bring a separate abuse of process claim, it has been abandoned."[223]

However, Tolston's briefing makes clear that Tolston sought to hold officers accountable because "Officers Holland and Wadsworth engaged in a malicious scheme to charge Plaintiff for three charges in retaliation for attempting to report their conduct."[224] Thus, the district court erred in granting summary judgment on Tolston's malicious prosecution and abuse of process claim.

### 10. The District Court Erred When It Denied Tolston's Motion for A Preliminary Injunction Regarding Mandatory Use of Body Cameras

Upon review for an abuse of discretion, the Court should find that the district court erred when it denied Tolston's request for a preliminary injunction to "restrain or enjoin officers of the Atlanta Police Department from deactivating their body worn cameras at any point while interacting with a citizen who is detained or in their custody"[225] because failing to issue the injunction is contrary to the rule

[223] Dckt. 90-4 p. 175 n. 50.
[224] Doc. 176-2 p. 64.
[225] Dckt. 90-5 166, Tolston's Mot. for Injunctive Relief.

of equity.[226] The Court should use its awesome power to issue a nationwide injunction requiring officers of police departments with more than 100 officers to use body cameras that must stay recording for the entirety of a citizen's detention.

In *Los Angeles v. Lyons*, "Lyons was stopped by the defendant officers for a traffic or vehicle code violation and that although Lyons offered no resistance or threat whatsoever, the officers, without provocation or justification, seized Lyons and applied a chokehold [r]endering him unconscious and causing damage to his larynx."[227] Lyons sought an injunction restraining officers from using chokeholds because "Lyons' complaint alleged that two deaths had occurred as a result of the application of the chokeholds by the police."[228]

Instead of banning chokeholds by police, in analyzing the irreparable harm element, the court reasoned the facts did not warrant

---

[226] *Cunningham v. Adams*, 808 F. 2d 817, 819 (11th Cir. 1987) ("The grant or denial of a preliminary injunction rests within the sound discretion of the district court and is reversible on appeal only for an abuse of that discretion or if contrary to some rule of equity").
[227] *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)
[228] *Id.* at 113.

an injunction at all because, in their view, there was an insufficient likelihood that the same circumstances would remanifest.[229]

Here, the district court noted: “To obtain a preliminary injunction, a plaintiff must establish: “(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest.”[230]

In denying relief the district court presented two reasons: First, “Plaintiff has not shown any real or immediate threat that he will be injured by the challenged practice in the future.”[231] Second, the court ruled “the City is entitled to summary judgment on Tolston’s municipal liability claims” so Tolston’s “motion must be denied because he does not have a substantial likelihood of success on the merits.”[232]

### A. There is a Likelihood of Success on the Merits as Detailed Herein Therefore Tolston Satisfies the First Element for Injunction Relief

[229] *Lyons*, 461 U.S. 115.
[230] Dckt. 90-4 p. 190. .
[231] *Id.* n. 62 (citing *Lyons*, 461 U.S. 111).
[232] *Id.*

Should this superior Court deny summary judgment to the City of Atlanta regarding *Monell* liability, Tolston will have shown a likelihood of success on the merits. Thus, the sought injunctive relief should be issued because the aforementioned facts overwhelmingly demonstrate the likelihood for continued harm and also show the overwhelming public interest weighs in favor of the need for judicial intervention.

### B. Tolston and the General Public Face a Persistent Ongoing and Substantial Risk of Harm and Loss of *Brady* Material if the Injunction Does Not Issue

The constitutional harm of the failure to use body worn cameras is two-fold: It motivates officers to engage in misconduct with impunity; but **the *de facto* custom also spoliates evidence or otherwise destroys potentially exculpatory *Brady* material** [233]

The Supreme Court in *Brady v. Maryland* held: "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[234] Moreover, the Court uses

[233] *Brooks v. Miller*, 78 F. 4th 1271, 1271 (11th Cir. 2023).
[234] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

body camera footage to decide cases—including one that involved Brady material and body camera footage.[235]

Here, regarding the retention of video the body camera policy stated: "BWC recorded data shall remain stored on a secured APD approved storage network, in accordance with [T]he Georgia Records Act O.C.G.A. 50-18-92, 96, and 99 et seq." (emphasis added)[236] The policy mandated that videos from a "traffic stop"; "citizen encounters" and "citation" should be retained for 180 days.[237]

As technology advances with society so too must the law—therefore, the Court should endorse a modified view of qualified immunity whereby law enforcement officers are estopped from asserting qualified immunity against civil rights claims that arise from events where spoliations occurs and the officer is unable to overcome the

---

[235] *United States v. Laines*, 69 F.4th 1226, 1226 (11th Cir. 2023) ("And Laines's conviction does not hinge on Officer Blanco's credibility because Blanco's testimony was corroborated by that of the other officers and by body camera footage, as we explain later in this opinion."); See *United States v. Sapp*, No. 21-14394 (11th Cir. 2023) (unpublished) ("As for the remaining evidence that he received days to a week before trial — the body camera footage, crime scene photographs, and expert reports — he still cannot meet the third prong of the *Brady* analysis, which asks whether the government's delayed disclosure of evidence caused prejudice. ").

[236] 173-18 p. 7.

[237] *Id.*

rebuttable presumption the spoliation was done to destroy or intentionally fail to preserve evidence.

Thus, beyond the violation of Tolston's rights, this case implicates the duty of officers to preserve exculpatory evidence which is why injunctive relief is an imperative.

Had officers kept their body worn cameras activated for the totality of the time that Tolston was detained, then the Court would not be left to speculate about the veracity of Tolston's version of events—and the state may not have continued with a nineteen-month-long failed prosecution.

Georgia law recognizes the importance of BWC video retention—and the Court must acknowledge there can be no retention of video where there is no proper usage of the devices—especially in the face of indifference by policymaking officials and an unofficial custom of non-usage by officers.

The preservation of exculpatory evidence is wholly independent grounds for tying the use of body worn cameras to constitutional injury, but also shows that the public interest weighs heavily in favor of mandating the use of body cameras while a citizen is detained.

### A. IAmongst the Backdrop of the Societal Epidemic of Police Violence the Court Should Be Persuaded to Issue Injunctive Relief Mandating Body Camera Compliance as it is in the Overwhelming Public Interest

The public interest weighs heavily in mandating the activation of body cameras while a citizen is in custody because **more than 1,000 citizens, disproportionately Black, die every year at the hands of police**[238] **while less than 60 law enforcement officers are killed by civilians on an annual basis**.[239]

Moreover, since the death of George Floyd in 2020, such extrajudicial police killings have only increased with no meaningful action by federal or state legislatures to stem the civil and human rights abomination.[240] A statistically significant number of such extrajudicial killings occur at the hands of Atlanta police and in the State of Georgia. The courts are the last failsafe to protect the people from such executive tyranny—because what the Court should wonder

---

[238] Dckt. 90-5 p. 93, administrative orders 2020-28.
[239] Jamie Thompson, *Why Do More Police Officers Die by Suicide Than in the Line of Duty?,* New York Times, May 8, 2025.
[240] Steven Rich et al, *Since George Floyd's Murder, Police Killings Keep Rising, Not Falling*, New York Times, May 24, 2025.

is: What recourse are the people left with in the absence of judicial intervention when politicians and the police fail the people?

There is no doubt that if dashboard cameras were tampered with at crucial moments during a traffic stop or investigation the Court would find such behavior objectionable. The Court should find it preposterous that officers control what evidence and documentation is captured by body cameras.

Therefore, the Court should clearly establish that officers have a duty to record the entirety of citizen encounters whether through discussion in adjudicating the instant appeal—or through issuance of the sought preliminary injunction.

**VII. Conclusion**

800 years since the Magna Carta; 233 since the Bill of Rights; 248 years since the founding of the nation; 50 years since Stonewall; and 6 years since Tolston's arrest—upon independent review—the Court should rule in Tolston's favor on the issues presented herein—especially regarding issuance of injunctive relief. Justice, equity, due process, and the rule of law demand as much.

Respectfully submitted this 3rd day of the month of June in the year 2025.

*/s/*

*Justin Thomas Tolston, JD LLM*
justin.tolston@einji.org
5900 Balcones Drive
Suite 100
Austin, TX 78731
*Pro se* Appellant

## TABLE OF AUTHORITY

### CASES

*Alcocer v. Mills*,
906 F.3d 946 (11th Cir. 2018)....................77
*Alsaada v. City of Columbus*,
536 F. Supp.3d 216 (S. D. Ohio April 30, 2021)....................50
*Anderson v. City of Atlanta*,
778 F. 2d 680 (11th Cir. 1985)....................63, 64, 67
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................25
*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*,
520 U.S. 397 (1997)....................61
*Benning v. Comm'r, Ga. Dep't of Corr.*,
71 F. 4th 1326 (11th Cir. 2023)....................74
*Brady v. Maryland*,
373 U.S. 83 (1963)....................56, 86, 87
*Brannon v. Finkelstein*,
754 F.3d 1269 (11th Cir. 2014)....................74
*Brooks v. Miller*,
78 F. 4th 1271 (11th Cir. 2023)....................86
*Brooks v Schieb*,
813 F.2d 1192 (11th Cir. 1987)....................31,32,33
*Brown v. Johnson*,
387 F.3d 1345 (11th Cir. 2004)....................23
*Calhoun v. Pennington*,
1:09-cv-03286 (N. D. Ga Dec. 08, 2010)....................13, 22, 75
*Case v. Eslinger*,
555 F .3d 1322 (11th Cir. 2009)....................77
*City of Canton v. Harris*,
489 U.S. 381 (1988)....................31

*City of St. Louis v. Praprotnik*,
485 U.S. 112, 127 (1988)....................................................................31
*Cantu v. City of Dothan, Ala.*,
974 F. 3d 1220 (11th Cir. 2020)..........................................................64
*Chiaverini v. City of Napoleon, Ohio*,
144 S. Ct. 1748 (2024)........................................................................79
*Church v. City of Huntsville*,
1335, 1342 (11th Cir. 1994).........................................................23, 24
*Cox v. Treadway*,
75 F.3d 232 (6th Cir. 1996)................................................................21
*Cuesta v. School Bd. Of Miami Dade Cty. Fla.*,
285 F.3d 964 (11th Cir. 2002)............................................................31
*Cunningham v. Adams*,
808 F. 2d 817 (11th Cir. 1987)............................................................84
*Davis v. Williams*,
451 F.3d 759 (11th Cir. 2006)............................................................75
*Doe v. Pryor*,
344 F.3d 1283 (11th Cir. 2003)..........................................................19
*George v. Home*,
684 F. Supp.3d 1348 (N. D. Ga. April 21, 2023)...............................49
*Goebert v. Lee Cty.*,
510 F.3d 1316 (11th Cir. 2007)..........................................................31
*Gold v. City of Miami*,
151 F.3d 1346 (11th Cir. 1998)..........................................................31
*Gretch v. Clayton Cty., Ga*,
335 F.3d 1327 (11th Cir. 2003)..........................................................29
*Griffin v. City of Opa-Locka*,
261 F.3d 1298 (11th Cir. 2001)..........................................................68
*Hall v. Flournoy*,
975 F. 3d 1271 (11th Cir. 2020)............................................................7
*Hartman v. Moore*,
547 U.S. 250 (2006)...................................................................74, 81
*Hassan v. City of Atlanta*,
1:21-CV-4629-TWT (N. D. Ga. June 1, 2021)...................................50

*Heck v. Humphrey*,
512 U.S. 477 (1994)....................................................................80
*Hensley v. Eckerhart*,
461 US 426 (1983)......................................................................63
*Hinds v. FDIC*,
137 F.3d 153 (3rd Cir. 1998)........................................................21
*Honiga v. Doe*,
484 U.S. 308 (1988)....................................................................163
*Hoyt v. Cooks*,
672 F.3d 974 (11th Cir. 2012)........................................................9
*Jackson v. City of Atlanta*,
22-12946 (11th Circuit 2024)........................................................19
*Jones v. Louisville/Jefferson Cty. Metro Gov't*,
482 F.Supp.3d 589 (W. D. Ky. Aug. 31 2020)................................41
*Kabbaj v. John Doe 1-10*,
6000 F. App'x 638, 641 (11th Cir. 2015).......................................20
*Keith v. DeKalb Cty.*,
749 F.3d 1038 (11th Cir. 2014).....................................................46
*Luke v. Gulley*,
50 F.4th 90 (11th Cir. 2022).........................................................78
*City of Los Angeles v. Lyons*,
461 U.S. 95(1983)...................................................................84, 85
*Mandel v. Doe,*
888 F.2d 783 (11th Cir.1989).......................................................29
*Martinez-Rivera v. Sanchez Ramos*,
498 F.3d 5 (1st Cir. 2007)............................................................22
*McDowell v. Brown*,
392 F. 3d 1285 (11th Cir.2004)..........................................61, 62, 65
*Miller v. U.S. Dep't of Agr. Farm Servs. Agency*,
143 F.3d 1413 (11th Cir. 1998).....................................................23
*Monell v. Dep't Soc. Serv. of the City of New York*,
436 U.S. 660 (1978) ................................24,28, 51, 52, 58, 72, 86
*Munz v. Parr,*
758 F.2d 1256 (8th Cir.1985).......................................................21
*Oklahoma City v. Tuttle*,

471 U.S. 810 (1985)....................52, 53, 59

*Pembaur v. City of Cincinnati*,
475 U.S. 471 (1986)....................53

*Perez v. Does 1-10*,
931 F.3d 642 (8th Cir. 2019)....................21

*Pilgrim v. City of Atlanta*,
1:21-CV-2472-TWT (N. D. Ga. Oct. 13, 2023)....................50

*Polk Cty. v. Dodson*,
454 U.S. 312 (1981)....................32

*Powell v. Snook*,
25 F. 4th 915 (11th Cir. 2022)....................78

*Richardson v. Johnson*,
598 F.3d 734 (11th Cir. 2010)....................20

*Richmond v. Badia*,
47 F.4th 1172 (11th Cir. 2022)....................70

*Simmons v. Bradshaw*,
879 F.3d 1157 (11th Cir. 2018)....................53

*Underwood v. City of Bessemer*,
11 F. 4th 1321 (11th Cir. 2021)....................52, 59

*United States v. Laines*,
69 F.4th 1226 (11th Cir. 2023)....................87

*United States v. Sapp*,
No. 21-14394 (11th Cir. 2023)....................87

*Vielma v. Gruler*,
808 F. App'x 872 (11th Cir. 2020)....................21

*Wayne v. Jarvis*,
197 F.3d 1098 (11th Cir. 1999)....................20

*West v. Tillman*,
496 F.3d 1324 (11th Cir. 2007)....................68

*Williams v. Radford*,
64 F.4th 1188 (11th Cir. 2023)....................73

*Williams v. Aguirre*,
965 F. 3d 1152 (11th Cir.2020)....................9

*Zinermon v. Burch*,

494 US 114 (1990)........................................................................63

**Constitutional Amendments**

First Amendment..............................................8, 18, 27, 73, 74, 76
Fourth Amendment..................................................76, 77, 80
Fourteenth Amendment..........................................77, 79

**Statutes**

42 U.S.C. § 1983..............................................23, 28, 68, 79, 83
O.C.G.A. § 50-18-92..................................................................87
O.C.G.A. § 50-18-96..................................................................87
O.C.G.A. § 50-18-99..................................................................87

**City Ordinances**

Atlanta, Ga., Code § 10-9..........................................................14, 82
Atlanta, GA., Code § 106-81.7...................................................14, 82
Atlanta, Ga., Code § 110-59........................................................14, 82

**Other Material**

Jamie Thompson, *Why Do More Police Officers Die by Suicide Than in the Line of Duty?,* New York Times, May 8, 2025............................

Steven Rich et al, Since George Floyd's Murder, Police Killings Keep Rising, Not Falling, New York Times, May 24, 2025...........................

## CERTIFICATE OF INTERESTED PERSONS

| | |
|---|---|
| 1. Battle, James | 9. Holland, Lawrence |
| 2. Brown, Hon. Michael L. | 10. Kinsly, Nicholas |
| 3. Bryant, Rodney | 11. Taxpayers of the City of Atlanta |
| 4. Callins, Joel | 12. Tolston, Justin Thomas |
| 5. City of Atlanta | 13. Wadsworth, Keith |
| 6. Dickens, Andre | 14. Walton, Gartrell |
| 7. Friduss, Phil | 15. Ware, David R. |
| 8. Geraghty, Hon. Sarah E. | |

*/s/*

*Justin Thomas Tolston, JD LLM*
justin.tolston@einji.org
5900 Balcones Drive
Suite 100
Austin, TX 78731
*Pro se* Appellant

## CERTIFICATE OF COMPLIANCE AND CORPORATE INTEREST STATEMENT

The undersigned Appellant hereby certifies that this Opening Appellant Brief, which has a word count of 12,983 words, has been prepared with margins according to the appeal court's rules, and is drafted with the font and point selections approved by the Court, specifically Century Schoolbook 14-point font.

The foregoing motion is in line and complies with Fed. R. App. P. 32(g)(1). Also, pursuant to 1lth Cir. R. 26.l-1, Appellant certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted this 3rd day of the month of June in the year 2025.

*/s/*

*Justin Thomas Tolston, JD LLM*
justin.tolston@einji.org
5900 Balcones Drive
Suite 100
Austin, TX 78731
*Pro se* Appellant

## CERTIFICATE OF SERVICE

I, *pro se* Appellant Justin Thomas Tolston, hereby certify that I have, on this day, served a copy of the foregoing Opening Appellant Brief upon:

All Appellees electronically via the Court's CM/ECF system.

Respectfully submitted this 3rd day of the month of June in the year 2025.

*/s/*

*Justin Thomas Tolston, JD LLM*
justin.tolston@einji.org
5900 Balcones Drive
Suite 100
Austin, TX 78731
*Pro se* Appellant